Eric A. FORETICH, Vincent P. Foretich,
and Doris Foretich, Plaintiffs,

v.

GLAMOUR, Conde Nast Publications,
S.I. Newhouse, Jr., Judith Coyne,
and Bob Trebilcock, Defendants.

Civ. A. No. 89–3099.

United States District Court,
District of Columbia.

Oct. 5, 1990.

Memorandum Re Remaining Claims
Dec. 19, 1990.

This is one of series of suits and counter-suits filed in the Washington metropolitan area arising out of a bitter, lengthy, and highly-publicized child custody proceeding before the Superior Court of the District of Columbia. In this instance, Eric Foretich and his mother and father have brought a libel action claiming, primarily, that they were defamed by an article in the November 1988 issue of *Glamour* magazine. The subject of the article was the court dispute between Eric Foretich and his former wife, Elizabeth Morgan, over their daughter Hilary, which involved allegations that Foretich had sexually abused Hilary, and Morgan's incarceration for failing to disclose Hilary's location to the presiding Superior Court judge.

The Complaint was filed in the Superior Court on October 16, 1990, and promptly removed by defendants to this Court. Because plaintiffs' formal pleadings have failed to particularize their defamation claims in the manner still required for this type of common law action,[1] the Court has been obliged to rule on issues presented seriatim after obtaining further clarification through submission of an Amended Complaint and limited discovery. Still, only the principal claims are now ripe for disposition.[2]

After the initial round of briefing, the Court held that plaintiffs' claims for defamation and emotional distress based on the original publication of the *Glamour* article were barred by the applicable one-year statute of limitations, D.C.Code § 12–301(4). Because the factual record was incomplete with respect to a possible republication of the article, the Court directed that limited discovery proceed on that issue, to be followed by further motion papers. The Court also approved filing of

Elaine Mittleman, Falls Church, Va., for plaintiffs.

Roslyn A. Mazer, Washington, D.C., for defendants.

## MEMORANDUM

GESELL, District Judge.

Defendants have moved for partial summary judgment. Plaintiffs have opposed. The motion has been fully briefed.

---

1. "The standard for successfully pleading defamation tends to be more stringent than ordinary civil suits.... Thus many of the traditional attitudes toward pleading in this context have survived the adoption of the federal rules." 5 Wright and Miller, *Federal Practice and Procedure* § 1245.

2. Subsidiary claims concerning publication of a letters to the editor page in the January 1989 *Glamour* and an item in the December 1989 *Glamour* recognizing Elizabeth Morgan as "Mother of the Year" will be referenced later in this Memorandum.

an Amended Complaint.[3] *Foretich v. Glamour*, 741 F.Supp. 247 (D.D.C.1990).

The discovery having been completed, defendants now move on additional papers for partial summary judgment arguing that (1) there was no republication of the November 1988 article; (2) even if there was a republication, as a matter of law they cannot be held liable; and (3) even if defendants can be held liable for republication, any claim based on the republication is itself time-barred. For the reasons discussed below, the Court rejects the first two arguments but holds that the third is correct and therefore grants all defendants summary judgment on all claims based on the November 1988 article.

## I. *Facts*

The uncontroverted facts relevant to the republication issue are as follows:

(1) On or about October 12, 1988, Conde Nast, a division of Advance Magazine Publishers, Inc., distributed approximately 2.9 million copies of the "November 1988" issue of *Glamour* magazine to subscribers and wholesalers.

(2) The November 1988 *Glamour* contained an article on the Foretich–Morgan case entitled "Hiding Hilary," ("the *Glamour* article") written by and credited to defendant Bob Trebilcock, a freelance journalist based in New Hampshire.

(3) By contract dated May 20, 1988, *Glamour* had acquired from Trebilcock the first North American rights to the *Glamour* article, but Trebilcock retained sole rights to grant permission to reprint the article subsequent to its single publication in *Glamour*.

(4) By a series of telephone calls and letters, Alice Monroe, Coordinator of Friends of Elizabeth Morgan ("FOEM"), obtained from Trebilcock permission to make 400 copies of the *Glamour* article ("the FOEM reprints"). FOEM, which operates from a post office in Merrifield, Vir-

ginia, is an organization that has supported Morgan in her dispute with Foretich.

(a) In late October 1988, following publication of the November 1988 *Glamour* Monroe contacted the *Glamour* offices in New York seeking permission to make and distribute copies of the *Glamour* article. *Glamour* informed Monroe that she would have to obtain permission from Trebilcock, who owned the reprint rights.

(b) In late October 1988, Monroe telephoned Trebilcock and tentatively obtained his permission to reprint the *Glamour* article.

(c) By letter on FOEM stationery dated October 29, 1988, Monroe wrote to Diana Edkins, the Permissions Editor at *Glamour* requesting permission "to reproduce (photocopy)" the *Glamour* article. Monroe's letter stated in part:

> As coordinator of a grassroots organization formed to call public attention to the unjust incarceration of Dr. Elizabeth Morgan, I send literature explaining the truth at the core of this case to a rapidly growing list of individual supporters and newspaper columnists throughout the country. We have extended our thanks to your editor-in-chief, Ms. Ruth Whitney, for her courage in publishing Bob Trebilcock's story. The issue of child sexual abuse is not exactly popular reading, as most of us hate to believe any person could perpetrate such evil, so GLAMOUR should be commended for having the guts to champion an innocent child and the mother who has suffered so much for trying to protect her.
>
> I have talked with Bob Trebilcock and he has given his permission as the author, but suggested I also obtain your permission. We plan to photocopy the article, as it is my understanding you cannot provide reprints.

(d) By letter on FOEM stationery dated October 30, 1988, to Trebilcock, Monroe requested "written permission to

---

**3.** In addition, the Court dismissed plaintiffs' claims for "false light" defamation for failure to state a claim under the applicable (Virginia) law and dismissed claims purportedly brought on behalf of Hilary Foretich.

photocopy your article in GLAMOUR." The letter stated in part:

> Thanks again for the wonderful article you did for GLAMOUR. We desperately need something honest, something we could tell people to read. They all have such misperceptions about the case. You have done us all a great service by providing the only fact-based story available to the public. . . .
>
> We plan to send it to our ever-growing list of individuals who support Elizabeth Morgan and also to columnists and journalists throughout the country. The print media have been very leery of investigating this case. Maybe with your example they will have the courage to plunge in.

(e) By letter dated October 31, 1988, Trebilcock informed Monroe that having spoken to his editor at *Glamour*, he understood that *Glamour* owned "First Publication rights only" and he owned "all reprint rights" to the *Glamour* article. Trebilcock asked that Monroe put her request in writing to be certain whose permission was required. Trebilcock then provided the following conditions for granting his permission:

(i) "That the copies be used in a nonprofit, non-commercial manner."

(ii) That distribution of the copies not begin until November 15, 1988, when the November *Glamour* would be removed from newsstands.

(iii) That the copies carry a disclaimer stating, "Hiding Hilary is reprinted from the November 1988 issue of Glamour with the permission of the author. Permission does not constitute an endorsement by the author of Glamour magazine of the organization 'The Friends of Elizabeth Morgan' or their actions on behalf of Elizabeth Morgan."

(f) On November 3, 1988, Edkins wrote to Monroe to indicate that Trebilcock, not Conde Nast, owned the rights to the *Glamour* article. Edkins requested that if Trebilcock gave permission to reprint, "the following credit/copyright line must

appear at the end of the article: Courtesy SELF. Copyright 1988 by The Conde Nast Publications." [4]

(g) By letter dated November 7, 1988, Trebilcock advised Cathy Perry, a Pasadena, California, marketing consultant, that he retained "all reprint rights" to the *Glamour* article and granted permission to reprint 2000 copies—1600 for the National Organization for Women and 400 for FOEM—"under the provision outlined in my previous letter to Alice Monroe." Trebilcock specifically reiterated the requirements that no distribution occur before November 15 and that the reprints include the disclaimer.

(h) By letter dated November 7, 1988, Trebilcock advised Edkins of his arrangement with Perry and Monroe.

(5) Perry arranged with William Tracy & Company of San Francisco to print the 2000 copies of the *Glamour* article.

(6) FOEM began distributing the FOEM reprints to members of the media and the public in late November 1988. Also in November 1988, FOEM distributed the FOEM reprints at their picketing site outside the D.C. Superior Court. (Affidavit of Alice Monroe at 3–4.)

(7) Eric Foretich, who has an oral surgery practice in northern Virginia, states that he was first informed by a few dentists that they had received copies of the *Glamour* article in envelopes marked "FOEM" and postmarked Merrifield, Virginia, approximately one month to eight weeks after the issue of *Glamour* containing it was published. (Foretich dep. at 11, 42). About a dozen Virginia dentists have submitted unsworn written statements indicating that they received the *Glamour* article or related articles in the mail between 1988 and 1990. Some recall that the envelopes were marked "FOEM" and/or postmarked Merrifield, Virginia. Alice Monroe denies that FOEM undertook "a targeted mailing" to dentist colleagues of Eric Foretich.

(8) Apart from the addition of the disclaimer and a notice of the Conde Nast

---

**4.** *Self* is another Conde Nast magazine. Edkins

presumably meant to indicate *Glamour.*

copyright[5] and the removal of the advertisements, the FOEM reprints are identical reproductions of the *Glamour* article as it appeared in the pages of *Glamour*.

(9) Plaintiffs filed their original complaint in Superior Court on October 16, 1989.

(10) Plaintiffs filed their Motion for Leave to File an Amended Complaint, with the proposed amended complaint attached, on January 18, 1990.

## II. *Distribution of the FOEM reprints was a republication*

As the Court's April 3 Memorandum stated, limitations periods in diversity cases in this Court are fixed by District of Columbia law. *Steorts v. American Airlines, Inc.*, 647 F.2d 194, 197 (D.C.Cir.1981). Forum law appropriately controls not only the limitations period itself, but the legal rules for determining whether the statute has run, such as whether or not a republication has occurred. *See, e.g., Association for the Preservation of Freedom of Choice v. Simon*, 299 F.2d 212 (2nd Cir.1962).

■ The common law "multiple publication" rule is that each sale of a writing is a separate publication, giving rise to a cause of action. *See Ogden v. Association of the United States Army*, 177 F.Supp. 498, 499–500 (D.D.C.1959). By contrast, the modern "single publication rule" provides that in the case of a single, integrated publication of a periodical or edition of a book or similar aggregate communication, the statute of limitations runs from the date on which a publication was first made available to the general public. *See Fleury v. Harper & Row, Publishers, Inc.*, 698 F.2d 1022, 1026–27 (9th Cir.1983); *Gregoire v. G.P. Putnam's Sons*, 298 N.Y. 119, 81 N.E.2d 45 (1945). The "single publication rule" was explicitly adopted by Judge Holtzoff of this Court in *Ogden*, 177 F.Supp. at 502, and, as indicated in the Court's April 3

Memorandum, the Court does not doubt that this modern rule is the appropriate one in this jurisdiction. *See* Restatement (Second) of Torts § 577A at 208 (1977).

■ However, subsequent publications of the same material, such as new editions of a newspaper or book, or rebroadcast of a television program, are new publications, or republications, that trigger a new cause of action and commence a new limitations period. Restatement § 577A comment d at 210; R. Smolla, LAW OF DEFAMATION § 4.13[4] at 4–66 (1986).

■ Defendants attempt to paint the FOEM reprints as "incidental secondary distributions" of the *Glamour* article itself, rather than a distinct republication. *See Church of Scientology of Minnesota v. Minnesota Medical Ass'n*, 264 N.W.2d 152 (Minn.1978); *Founding Church of Scientology of Washington, D.C. v. American Medical Ass'n*, 60 Ill.App.3d 586, 18 Ill.Dec. 5, 377 N.E.2d 158 (Ill.App.Ct.1978). Defendants suggest that to hold them liable for the FOEM reprints would expose any publisher or author to liability for any photocopies distributed by it or third parties and thus "cause havoc with the law of libel" (*quoting Church of Scientology of Washington, D.C.*, 18 Ill.Dec. at 8, 377 N.E.2d at 161).

However, this is not a case where some unauthorized party distributed photocopies or where the original publisher did so incident to the original publication. Conde Nast, not Trebilcock, published the November 1988 *Glamour*. Once that issue was removed from the stands, publication rights in the article reverted to the copyright owner, Trebilcock. Trebilcock, not Conde Nast, granted FOEM permission to distribute the article. Trebilcock granted FOEM permission not to pass out complete copies of the November 1988 *Glamour* but to make a discrete set of photocopies of his article for FOEM's use.

---

5. On the FOEM reprints, the precise wording of the disclaimer is

"Hiding Hilary" is reprinted from the November 1988 issue of *Glamour Magazine* with the permission of the author. Permission does not constitute an endorsement by the author

or *Glamour Magazine* of the efforts of Friends of Elizabeth Morgan on her behalf.

The copyright notice states, "Courtesy: Glamour Magazine Copyright 1988, by the Conde Nast Publications, Inc."

The fact that the copies distributed were exact photocopies of the text as it appeared in *Glamour*, with the typesetting and arrangement of copy as it appeared in *Glamour* (with the only differences being the addition of the disclaimer and copyright notice and removal of advertisements) cannot control. Trebilcock owned the words. He had sold the rights to them to Conde Nast for a period, and the period had expired. The words were his again. He granted FOEM permission to use them. FOEM used the easiest means of reproducing them, i.e. photocopying the article and gaining the benefit of *Glamour*'s typesetting and art direction. But in essence, in spite of the small number of copies authorized, a separate republication occurred.

### III. *Defendant Trebilcock is liable for the republication*

■ The original publisher of a defamatory statement is liable for a republication only if the republication was reasonably foreseeable. *Tavoulareas v. Piro*, 759 F.2d 90, 136 n. 56 (D.C.Cir.1985), *rev'd*, 817 F.2d 762 (D.C.Cir.) (*en banc*), *cert. denied*, 484 U.S. 870, 108 S.Ct. 200, 98 L.Ed.2d 151 (1987). Plaintiffs claim that the liability of defendants *Glamour* magazine, The Conde Nast Publications, S.I. Newhouse, Jr., and Judith Coyne for the FOEM republication is a genuine issue of material fact, but plaintiffs do not indicate any specific facts that demonstrate such liability under the "reasonably foreseeable" standard. However, based on the undisputed facts it appears that the republication of the *Glamour* article in the form of the FOEM reprints was reasonably foreseeable to defendant Trebilcock. He affirmatively and deliberately granted permission to FOEM to copy and distribute the *Glamour* article. The correspondence in the record makes clear that Trebilcock knew that FOEM would be seeking to distribute the article to members of the media and that FOEM was a group dedicated to telling Morgan's side of the story. Whether or not FOEM actually sent copies to dentists and whether or not Trebilcock could foresee such a distribution is of little relevance. Trebilcock knew from his communications with Monroe and his knowledge of the Foretich–Morgan dispute that FOEM's aim was to publicize the controversy and vindicate Morgan and that Monroe believed that further distribution would aid FOEM's efforts. In that sense he could reasonably foresee not only the distribution itself but also the fact that it might tend to create additional publicity adverse to plaintiffs.

### IV. *The republication claim is barred by the statute of limitations*

■ While the Court concludes that defendant Trebilcock is not free from liability for the FOEM republication as a matter of law, the Court finds that plaintiffs' claims against him for the FOEM republication are time-barred.

■ Plaintiffs' claims for defamation and for intentional infliction of emotional distress are, as previously indicated, governed by the one-year limitations period for libel set by D.C.Code § 12–301. *See Foretich v. Glamour*, 741 F.Supp. at 251. Defamation occurs on publication, and the statute of limitations runs from the date of publication. *Fitzgerald v. Seamans*, 553 F.2d 220, 227 (D.C.Cir.1977). Under the single publication rule, the date of publication for the FOEM reprints was the date they were "published," i.e. the date the first copies were distributed. There is no dispute that FOEM began distributing the FOEM reprints in November 1988.

Publication of the FOEM reprints thus occurred less than one year before the original Complaint was filed on October 16, 1988. However, the original Complaint did not claim that defendants were liable for the FOEM reprints. It simply alleged:

> Upon information and belief, copies of the *Glamour* article were sent by the Friends of Elizabeth Morgan to many of the dentists with whom Dr. Foretich has professional relationships and acquaintance.

By contrast, the Amended Complaint, filed as an exhibit to plaintiffs' motion for leave to amend on January 18, 1990, repeated the above paragraph, added that

FOEM distributed copies at their picketing sites and then alleged:

> Upon information and belief, the November 1988 article has been used by the Friends of Elizabeth Morgan, with the permission of *Glamour*, to facilitate the creation of a negative image of Dr. Foretich and the D.C. Superior Court.

■ The Amended Complaint was filed more than one year after the start of the FOEM distribution of reprints authorized by Trebilcock. Accordingly, the new claim in the Amended Complaint that *Glamour* authorized the FOEM republication can be maintained only if it is related back to the date of filing of the original Complaint.

Federal Rule of Civil Procedure 15(c) states:

> RELATION BACK OF AMENDMENTS: Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading.

■ The general practice under Rule 15(c) is to permit relation back so long as the new claim arose out of the defendant's conduct as set forth in the original complaint and the original complaint gave defendant notice sufficient to avoid prejudice. *See Schiavone v. Fortune*, 477 U.S. 21, 106 S.Ct. 2379, 91 L.Ed.2d 18 (1986); 6A Wright and Miller, *Federal Practice and Procedure* § 1497.

Courts have repeatedly refused, however, to relate back a defamation claim based on a separate republication where the original complaint did not allege such republication. *See Jackson v. Ideal Publishing Corp.*, 274 F.Supp. 318 (E.D.Pa. 1967); *Rickman v. Cone Mills Corp.*, 129 F.R.D. 181 (D.Kan.1989); *Cole v. Atlanta Gas Light Co.*, 144 Ga.App. 575, 241 S.E.2d 462 (1978); *Municipal Training Center, Inc. v. National Broadcasting Corp.*, 87 Misc.2d 1044, 387 N.Y.S.2d 40 (N.Y.Sup.Ct. 1976). *Cf. Kakuris v. Klein*, 88 Ill.App.3d 597, 43 Ill.Dec. 851, 854–55, 410 N.E.2d 984, 988–89 (1980); *Pendrell v. Chatham College*, 386 F.Supp. 341 (W.D.Pa.1974); *Hartmann v. Time, Inc.*, 64 F.Supp. 671 (E.D.Pa.1946), *modified*, 166 F.2d 127 (3rd Cir.1947); *cert. denied*, 334 U.S. 838, 68 S.Ct. 1495, 92 L.Ed. 1763 (1948). Similarly here, Trebilcock's role in the FOEM republication was a separate occurrence from the original publication, and relation back as to him is not appropriate under Rule 15(c).

Clearly it was not until the Amended Complaint was filed in January 1990 that plaintiffs even suggested that they sought to claim for specific conduct by defendants with respect to any republication of the *Glamour* article by FOEM. At the time he received service of the original Complaint, Trebilcock knew that he had played a role in the FOEM distribution, but he had no reasonable basis to believe from the face of the complaint that he was being sued for anything other than the original publication in *Glamour*. It was appropriate for him and all other defendants, as well as counsel, to believe that the reference in the original complaint to the FOEM distribution was an allegation relevant to plaintiff's claim of harm from the original publication rather than a distinct claim of conduct by one or more defendants. Moreover, Monroe had represented to Trebilcock that the 400 copies would go to members of the media and Morgan supporters. Nothing in the record indicates that Trebilcock had reason to suspect that the 400 reprints he had authorized were the copies plaintiffs, in the original Complaint, claimed were sent to dentist colleagues of Eric Foretich.

Moreover, even the Amended Complaint failed to give adequate notice of the republication claim, because it names the wrong defendant, *Glamour*, as responsible for the republication, and only obliquely at best infers, rather than claims, that a republication occurred. Indeed, plaintiffs never even claimed that a republication occurred in their briefs on defendants' original dispositive motion; the issue was suggested *sua sponte* by the Court in its April 3 Memorandum for clarification.

Plaintiffs assert that "[a]t a minimum, any republications after January 18, 1989, are certainly not time-barred." But there is no evidence in the record of any liability

of any defendant for any republication beyond the permission given by Trebilcock to FOEM in November 1988 and the FOEM distribution that began later that month. The single publication rule applies to the FOEM distribution as it would to any other publication or republication, and the statute runs from the start, not the end, of the republication.

Accordingly, plaintiffs' claims in the Amended Complaint for defamation and intentional infliction of emotional distress based on the republication by FOEM of the *Glamour* article are barred by the applicable one-year statute of limitations, and defendants' Motion for Partial Summary Judgment will be granted.

## V. *Remaining claims*

With the central claims in the case now dismissed, the Court turns to plaintiffs' remaining claims. It is not clear from the Amended Complaint precisely which words, if any, in the January 1989 and December 1989 issues of *Glamour* plaintiffs claim are defamatory. Moreover, further briefing of some of the remaining issues may be appropriate in light of the Supreme Court's decision in *Milkovich v. Lorain Journal Co.*, — U.S. —, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990).[6]

Plaintiffs, if they are to proceed with the case, are directed to file, by October 22, 1990, a detailed statement of the remaining claims in the Amended Complaint for which they seek relief. The statement shall not address any claims dismissed by the Court and shall not add any new claims. In pleading the defamation claim, plaintiffs' statement shall directly quote the precise statements in the January 1989 and/or December 1989 editions of *Glamour* plaintiffs claim are defamatory. Plaintiff shall also plead with respect to each allegedly defamatory statement the alleged inducement, if any. Except if necessary to state the inducements, the statement shall not add any new factual assertions. If any claim for intentional infliction of emotional distress

arising entirely from the January 1989 and December 1989 issues of *Glamour* remains in the case, plaintiffs shall plead the precise facts underlying the claim and set forth any special damages.

Defendants shall file a new brief in support of their dispositive motion by November 5, 1990. Plaintiffs may respond by November 19, 1990, and defendants may reply by November 26, 1990. General discovery remains stayed pending resolution of this motion. An appropriate Order is attached.

## ORDER

Upon consideration of defendants' Motion for Partial Summary Judgment, the opposition thereto, and the entire record herein, and for the reasons stated in the accompanying Memorandum, it is hereby

ORDERED that defendants' Motion for Partial Summary Judgment is granted; and it is further

ORDERED that all claims against all defendants in the Amended Complaint for defamation and intentional infliction of emotional distress concerning the article "Hiding Hilary" in the November 1988 *Glamour* magazine and any republication of that article are dismissed with prejudice as barred by the applicable statute of limitations, D.C.Code § 12–301(4); and it is further

ORDERED that plaintiffs, if they are to proceed with the case, shall file, by October 22, 1990, a detailed statement of the remaining claims in the Amended Complaint for which they seek relief. The statement shall not address any claims dismissed by the Court and shall not add any new claims. In pleading the defamation claim, plaintiffs' statement shall directly quote the precise statements in the January 1989 and/or December 1989 editions of *Glamour* plaintiffs claim are defamatory. Plaintiff shall also plead with respect to each allegedly defamatory statement the alleged inducement, if any. Except if necessary to state the inducements, the statement shall

---

6. In the original round of motion papers, defendants urged dismissal of most or all of these claims on the grounds that certain of the state-

ments concerned are not capable of defamatory meaning and others are not "of and concerning" plaintiffs.

not add any new factual assertions. If any claim for intentional infliction of emotional distress arising entirely from the January 1989 and December 1989 issues of *Glamour* remains in the case, plaintiffs shall plead the precise facts underlying the claim and set forth any special damages; and it is further

ORDERED that defendants shall file a new brief in support of their dispositive motion by November 5, 1990. Plaintiffs may respond by November 19, 1990, and defendants may reply by November 26, 1990; and it is further

ORDERED that no extensions of time will be granted; and it is further

ORDERED that general discovery remains stayed pending resolution of the motion.

## MEMORANDUM RE
## REMAINING CLAIMS

The Court dismissed the principal claims in this complaint alleging libel and intentional infliction of emotional distress because the statute of limitations had run on these claims to the extent they arose from an article that appeared in the November 1988 issue of *Glamour* magazine and a subsequent republication. *See Foretich v. Glamour*, 741 F.Supp. 247 (D.D.C.1990); *Foretich v. Glamour*, Civil Action No. 89–3099, slip op. 753 F.Supp. 955 (D.D.C. October 5, 1990). The Court reserved for later consideration a few somewhat similar claims not barred by the statute of limitations based upon statements in the subsequent January 1989 and December 1989 issues of *Glamour*. These remaining claims, set forth in the Amended Complaint filed January 18, 1990, are now before the Court on defendants' further motion to dismiss, which has been fully briefed.

### I. *Background*

In order to bring these remaining claims into sharper focus, the Court ordered plaintiffs—Eric Foretich and his parents, Vincent and Doris Foretich—to submit, prior to briefing of the motion to dismiss

 a detailed statement of the remaining claims in the Amended Complaint for

which they seek relief. The statement shall not address any claims dismissed by the Court and shall not add any new claims. In pleading the defamation claim, plaintiffs' statement shall directly quote the precise statements in the January 1989 and/or December 1989 editions of *Glamour* plaintiffs claim are defamatory. Plaintiff shall also plead with respect to each allegedly defamatory statement the alleged inducement, if any. Except if necessary to state the inducements, the statement shall not add any new factual assertions. If any claim for intentional infliction of emotional distress arising entirely from the January 1989 and December 1989 issues of *Glamour* remains in the case, plaintiffs shall plead the precise facts underlying the claim and set forth any special damages.

*Foretich v. Glamour*, 753 F.Supp. at 963 (D.D.C.1990). Plaintiffs filed their particularized Statement of Remaining Claims on October 22, 1990.

These claims arise from (1) certain statements taken from the "Letters from Readers" page in the January 1989 *Glamour* referring to the November 1988 *Glamour* article which was the subject of the principal claims previously dismissed by the Court; and (2) certain statements included in conjunction with *Glamour's* designation of Dr. Elizabeth Morgan, Eric Foretich's former wife, as one of twelve "Women of the Year" in the December 1989 *Glamour*.

Before analyzing the legal sufficiency of these claims it is necessary briefly to summarize the context in which this dispute arose. Eric Foretich, an oral surgeon, is the father and Elizabeth Morgan, a plastic surgeon, is the mother of a minor child, Hilary. After the couple divorced, they became embroiled in a highly publicized proceeding in the Superior Court of the District of Columbia over Foretich's rights to visit with Hilary. Morgan, who had been awarded custody subject to limited visitation rights for her ex-husband, adamantly refused to produce Hilary before the Court, as ordered, and beginning in 1987 she was jailed for 25 months because of her defiance. She justified her actions

in various statements claiming, among other things, that Foretich had sexually abused Hilary, a charge he vigorously denied at all times. The dispute was accompanied by vehement accusations back and forth and a rising media interest. Apart from the custody case in Superior Court, the dispute also went to trial on opposing tort claims by each side in the United States District Court for the Eastern District of Virginia.[1] By the time *Glamour* published its November 1988 article, the events and issues were being highly publicized nationally on television, radio and in many newspapers and magazines. Foretich made public appearances, as did Morgan following her release.

The controversy and the rulings of the presiding Superior Court judge engendered discussion on issues of public concern, including child abuse, women's rights, the intrusion of the state into private affairs, and the limits of punishment for contempt of court. Morgan's staunch, unrelenting position attracted both supporting and adverse comment. Ultimately, Congress became involved, enacting in 1989 special legislation signed by the President effecting Morgan's release from jail. *Glamour*, then published in New York by the Conde Nast organization, supported Morgan's position, as the publications challenged by the Amended Complaint reveal.

Six separate statements taken from the January and December 1989 issues of *Glamour* underlie the remaining defamation and emotional distress claims at issue here. With respect to defamation, defendants, in moving to dismiss, argue, *inter alia*, (1) that the statements are not capable of defamatory meaning; (2) that most of the statements are not "of and concerning" the plaintiffs; and (3) that some of the statements constitute constitutionally-protected "rhetorical hyperbole." With respect to the overlapping claims of intentional infliction of emotional distress, defendants argue that plaintiff's particularized allegations are insufficient to state a claim and in any case must fail because the underlying defamation claims fail. The

Court will first consider defamation and then consider intentional infliction of emotional distress.

## II. *Defamation*

■■■■ As to defamation, four of the statements, as particularized by plaintiffs, require little discussion:

(1) Plaintiffs attack publication of a statement in a letter to the editor in the January 1989 *Glamour* by the coordinator of a group known as Friends of Elizabeth Morgan that "a mother shall protect her young, no matter the cost to herself."

(2) Plaintiffs complain that an editor's note accompanying the Letters from Readers section in the January 1989 issue stated that *Glamour* was "taking the unusual step" of devoting the entire section to letters related to the earlier November 1988 article about the Foretich–Morgan case.

(3) Plaintiffs complain that a concluding editor's note on the January 1989 letters page referred readers to Friends of Elizabeth Morgan for further information and gave the group's address.

(4) Plaintiffs attack the designation, in the December 1989 *Glamour*, of Morgan as one of twelve "Women of the Year," each of whom "dazzled, inspired and enlightened us."

Plaintiffs repeatedly suggest that these statements are slanted in Morgan's favor, that they are unfair, particularly as they appear to endorse positions taken by Morgan and the Friends of Elizabeth Morgan, and that they must be taken to be malicious and capable of various far-fetched innuendoes. Media coverage of matters of contemporary public concern may not be so readily brought to account in defamation.

A recent decision of the Supreme Court of the United States controls the disposition of these four claims and requires they each be dismissed as a matter of law. In *Milkovich v. Lorain Journal Co.*, — U.S. ——, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990), the Supreme Court reasserted the constitutional rule established in *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767,

---

1. *See Morgan v. Foretich*, 846 F.2d 941 (4th Cir.1988).

106 S.Ct. 1558, 89 L.Ed.2d 783 (1986), that "a statement on matters of public concern must be provable as false before there can be liability under state defamation law, at least in situations ... where a media defendant is involved." 110 S.Ct. at 2706. The Supreme Court in *Milkovich* was at pains to emphasize that opinions which do not contain "a provably false factual connotation" are fully protected. *Id.* As *Milkovich* makes clear, the privilege of fair comment which underlies First Amendment protection of opinions published by the media relating to matters of public concern cannot be overridden unless the opinion, as particularized, implies a false statement of fact which a reasonable fact finder would perceive. *See also White v. Fraternal Order of Police*, 909 F.2d 512, 527 (D.C.Cir. 1990). The ultimate fact must then be such that plaintiff can prove its falsity; thus some generalized opinions or "rhetorical hyperbole" often found in the media are privileged even though they may be said to place a person in an unfair or unfavorable light.

Applying these principles to the four claims it is crystal clear that any substantive facts stated or reasonably implied from the statements (1) and (4) as set out above cannot be proven to be true or false; they constitute merely opinion. That a mother must protect her young and that Elizabeth Morgan is worthy of note cannot be deemed verifiable statements of fact. Nor can the apparent bias indicated by statement (2), suggesting the importance of the prior article, or statement (3), involving referral of readers to Friends of Dr. Elizabeth Morgan, however partisan, be converted into any actionable substantive fact. As

the Court has noted, the underlying issues presented by this highly publicized controversy in which Eric Foretich became involved were of mounting public concern. *Glamour* took sides and appeared to support Morgan, but its position alone cannot transform opinions or otherwise innocuous statements into defamation in the manner plaintiffs imply. One must not forget the implications of the often repeated truth taken from Justice Brennan's opinion for the Court in *Garrison v. Louisiana*, 379 U.S. 64, 74–75, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964) that "speech concerning public affairs is more than self-expression, it is the essence of self-government."

The Court also notes that plaintiffs' defamation claims based on statements (1) through (4) fail for the additional reasons that there is also serious doubt as to (a) whether any of the cited statements are "of and concerning" any of the plaintiffs, an essential element of a defamation claim under Virginia law,[2] which controls on all remaining claims;[3] and (b) whether any of the statements are capable of defamatory meaning.

▬▬▬ It is the Court's function to determine at the outset whether or not the statements claimed are capable of defamatory meaning. *Chaves v. Johnson*, 230 Va. 112, 335 S.E.2d 97, 102 (1985); *Wilder v. Johnson Publishing Co.*, 551 F.Supp. 622 (E.D.Va.1982); *Tavoulareas v. Piro*, 817 F.2d 762, 779 (D.C.Cir.), *cert. denied*, 484 U.S. 870, 108 S.Ct. 200, 98 L.Ed.2d 151 (1987); Restatement (Second) of Torts § 614(i) (1977). A statement is defamatory if it tends "to injure reputation, 'diminish the esteem, respect, goodwill or confidence in which the plaintiff is held, or to excite

---

**2.** *See Gazette, Inc. v. Harris*, 229 Va. 1, 325 S.E.2d 713, 738 *cert. denied sub nom. Fleming v. Moore*, 472 U.S. 1032, 105 S.Ct. 3513, 87 L.Ed.2d 643 (1985) and *Port Packet Corp. v. Lewis*, 473 U.S. 905, 105 S.Ct. 3528, 87 L.Ed.2d 653 (1985); *Ewell v. Boutwell*, 138 Va. 402, 121 S.E. 912 (1924); *General Products Co., Inc. v. Meredith Corp.*, 526 F.Supp. 546, 550 (E.D.Va.1981).

**3.** As the Court noted in a prior opinion in this case, 741 F.Supp. at 250–51, under the District of Columbia "interest analysis" approach to choice of law questions, *see Williams v. Williams*, 390 A.2d 4 (D.C.1978), the general rule

in a defamation case is that the applicable substantive law is that of the place where the plaintiff suffered the most significant harm to reputation. *Liberty Lobby, Inc. v. Dow Jones & Co., Inc.*, 838 F.2d 1287, 1293 n. 3 (D.C.Cir.), *cert. denied*, 488 U.S. 825, 109 S.Ct. 75, 102 L.Ed.2d 51 (1988). The papers show that Virginia is where plaintiffs' reputations would have been most seriously harmed. All three plaintiffs are residents of Virginia, and Eric Foretich's oral surgery practice is in Virginia. The same factors require the Court to apply Virginia law to the emotional distress claims.

adverse, derogatory or unpleasant feelings or opinions against him.' " *General Products Co., Inc. Meredith Corp.*, note 2, *supra*, at 549 (quoting Prosser, *Law of Torts* § 111 (4th ed. 1971)). As the Court recognized in instructing plaintiffs to fully state the inducement for each defamation claim in their Statement of Remaining Claims, defamation may be *per quod*, i.e. arising by innuendo from published words in combination with known extrinsic facts, as well as *per se*, i.e. appearing on the face of the publication. *Wilder*, 551 F.Supp. at 623–24. *See also Carwile v. Richmond Newspapers*, 196 Va. 1, 82 S.E.2d 588, 591–92 (1954) ("a defamatory charge may be made by inference, implication or insinuation"); *Gazette, Inc. v. Harris*, note 2, *supra*. However, in the case of defamation *per quod*, the defamatory meaning must flow readily from the extrinsic facts, or inducement, offered by the plaintiff. *Wilder*, 551 F.Supp. at 624–25. *See also White v. Fraternal Order of Police*, 909 at 518–21.

Statement (1) states or implies nothing defamatory about plaintiffs; it is merely a generalized view about a mother's duties. Statements (2) and (3) also say nothing defamatory about plaintiffs. Statement (4), which indicates that a group of twelve women "dazzled, inspired and enlightened" some unspecified persons associated with *Glamour*, barely says anything about Morgan, let alone the plaintiffs. Even in combination with the extrinsic facts offered in the inducements, none of these statements can be considered to defame any of the plaintiffs.[4]

The next statement at issue requires separate analysis:

■ (5) Plaintiffs attack a statement in the "Women of the Year" article that Morgan was "the mother of the year" and "spent 759 days behind bars—to protect her seven-year-old daughter Hilary."

Plaintiff's Statement of Remaining Claims states, "The reader could understand that *Glamour* believed Hilary should be hidden from the Foretichs." However, one reading of statement (5) and the inducement alleged by plaintiffs is that *Glamour* was expressing its factually unverifiable and vague opinion that Hilary required protection. On the other hand, a reading more sympathetic to plaintiff's case would be that *Glamour* itself was stating or implying as a fact that Morgan's incarceration accomplished the aim of actually protecting Hilary. So interpreted, this claim might survive *Milkovich*.

However, even if such a sympathetic reading is chosen, the Court concludes that the statement, in light of the particularized inducement provided, is not defamatory. Statement (5) itself only suggests that Hilary needed protection, and the inducement actually offered fails to state any reason why Hilary might have needed protection. The Court must take into account, as defendants note in their reply brief, that plaintiffs, having been asked by the Court to detail their claims, have now declined to plead, by innuendo or otherwise, Morgan's alleged reason for protecting Hilary from Eric Foretich, i.e. Morgan's belief that he sexually abused Hilary. Plaintiffs initially pursued this aspect of the case,[5] but plaintiffs have now, in their Statement of Remaining Claims, abandoned it.[6] Without any specific inducement creating an issue for factual development, the defamation claim as to statement (5) must fail. "The standard for successfully pleading defamation tends to be more stringent than ordinary civil suits.... Thus many of the traditional attitudes toward pleading in this

**4.** Plaintiff's claim based on statement (4) must be dismissed for the additional reason that it was not even mentioned in the Amended Complaint; the Court's October 5, 1990, Memorandum and Order specifically directed that plaintiffs' Statement of Remaining Claims not add any new claims to those in the Amended Complaint.

**5.** *See* Amended Complaint ¶ 12; Plaintiffs' Opposition to Defendants' Motion for Summary Judgment and to Dismiss for Failure to State a Claim, filed January 18, 1990, at 10.

**6.** Plaintiffs have not only declined to repeat this innuendo in their Statement of Remaining Claims but also have, by its omission, eliminated from contention the statement in the "Mother of the Year" item, attributed to Morgan and noted in the Amended Complaint, that "Jail is heaven compared to having your child raped."

context have survived the adoption of the federal rules." 5 Wright and Miller, *Federal Practice and Procedure* § 1245 at 302 (1990). Here the Court's October 5 Order required precise particularization, and plaintiffs, after ample opportunity, failed to plead their case. The claim must be dismissed.

■ The remaining defamation claim, Statement (6), is of a somewhat different character. It concerns an allegation contained in a reader's letter published in the January 1989 *Glamour* which essentially repeats and takes *Glamour* to task for having published in the November 1988 article that, as the reader paraphrased it, "Dr. Foretich's mother handed him the body of his infant sister just after she died so he could arrange for the funeral." The reader clearly thought the statement was false and in poor taste. The *Glamour* "editor's note" following the letter responded that the statement was taken from the deposition of a clinical psychologist, Nancy Fretta, Ph.D., who had testified that Foretich told her the story during a professional consultation.[7]

Plaintiffs' counsel contends that the passage from the letter and the editor's note could be understood by the reader to mean that the Foretich family acted inappropriately, in that it made a teen-ager hold a dead infant. It could also be read to mean that Dr. Foretich had psychological problems as a result of the strain and trauma of holding a dead infant. It could also be read to mean that the Foretichs were callous, uncaring and irresponsible about the death and funeral of their dead daughter.

Upon receipt of plaintiffs' brief, the Court noted that plaintiffs' counsel also alleged that the statement published and then republished in *Glamour* had incorrectly summarized the deposition. By Order dated November 21, 1990, the Court directed the parties to provide the deposition transcript in pertinent part and indicate if and when it was publicly filed. The parties submitted separate filings, which indicate that the deposition of Dr. Fretta was filed, not under seal, on March 20, 1987, in the litigation between the Foretichs and Morgan in the Virginia federal court.[8] Dr.

7. The reader's letter states in part:
 Your writer must be on Elizabeth Morgan's payroll, because he has written her heinous lies as *facts*. (One of the sickest was the statement that Dr. Foretich's mother handed him the body of his infant sister just after she died so he could arrange for the. funeral.)
 *Glamour*'s response states:
 Editor's note: Our source for the statement concerning Dr. Foretich's infant sister was a deposition made by Nancy Fretta, Ph.D., a clinical psychologist, who testified that Dr. Foretich had told her the story during a professional consultation.
 The statement, as it appeared in the original November 1988 *Glamour* article, is included in a passage briefly relating the backgrounds of Morgan and Foretich:
 Elizabeth Morgan was raised near Washington in a family of overachievers. Her parents, William and Antonia Morgan, were both psychologists who met in England during World War II. Today, Elizabeth's older brother Jim is a successful commodities trader, and Rob, her younger brother, is an assistant U.S. attorney in Washington, D.C.
 Even in this group, Elizabeth stood out. One month shy of her sixteenth birthday, she graduated from the Kent School in Connecticut; at nineteen, she received a Harvard degree. She attended Oxford for one term, then started Yale Medical School in the fall. Be-

 tween rounds as a resident she wrote a medical column for *Cosmopolitan.*
 Eric Foretich was a native Virginian. His mother, a Daughter of the American Revolution, taught art and his father was an engineer. He is his parents' only living child. When Eric was in his twenties, his younger brother was killed in an auto accident; *earlier, when he was in his teens, a sister died shortly after birth. Eric's mother handed him the dead infant, and he arranged for the funeral* [emphasis added].
 Elizabeth was Foretich's third wife. His first marriage lasted only a few years. Nearly ten years later, he married Cheryl Smithson [a pseudonym], a department store model fifteen years his junior. According to Cheryl, Foretich abused her physically and emotionally. He once became so angry, she testified in a deposition, that he yanked an intravenous needle out of her arm. At the birth of their daughter Katie [also a pseudonym], she has also testified, Foretich "had a temper tantrum," when· he learned the baby was a girl; he upset Cheryl so much that a resident asked him to leave the hospital room.

8. It appears that the Fretta deposition was never officially under seal. The exhibits to the submissions of the parties suggest that about four months after the deposition was publicly filed,

Fretta testified concerning her adult clinical psychological consultation with Eric Foretich, which covered his early emotional experiences. In pertinent part, Dr. Fretta testified that Foretich

> was talking about his brother's death. He was talking about the death of a younger female sibling and the events that ensued within his family because of those two deaths....

> He did ... talk about the impact that the loss of the two children had on his parents, and in essence, how the family became dysfunctional for a while, and his role in making arrangements for things that were really fairly inappropriate for a youngster at his age at the time. He was making funeral arrangements, selecting burial plots, you know, seeing the dead infant, things of that sort....

> He spoke about his dead infant sister and being given this child to hold as the mother is running screaming through the house.

The Court concludes that this aspect of the defamation claim should not be dismissed on the present motion. Statement (6) repeats an allegation suggested in the original November 1988 article—i.e. that plaintiff Doris Foretich handed plaintiff Eric Foretich a dead infant's body "so he could arrange for the funeral"—and then, in the face of the reader's challenge to its veracity, indicates a purported source, i.e. the Fretta deposition. Clearly a statement of fact is alleged, it is a fact of and concerning at least Eric and Doris Foretich, and the Court cannot say, on this motion to dismiss, that the statement was not capable of a defamatory meaning.[9]

### III. Intentional infliction of emotional distress

As previously indicated, plaintiffs' Amended Complaint also alleges a claim for intentional infliction of emotional distress based on the same publications. The assertion that defendants "acted intentionally or recklessly, with conduct which was extreme and outrageous," Amended Complaint ¶ 36, is particularized in plaintiffs' Statement of Remaining Claims, which alleges that publication of the statement "caused great anguish to the Foretich family." Plaintiffs first refer to Statement (6), the statement relating to the deceased Foretich infant. They contend (a) that the statement in the letter was false and wrongly bolstered by the reference to the Fretta deposition, which did not in fact support the statement; (b) that "[i]t is outrageous to speak falsely of intimate family details of no public concern which happened more than thirty years ago"; and (c) that defendants acted recklessly by relying on a deposition and should have confirmed the account through a "primary source," such as a family member. In addition, plaintiffs seek to bolster this emotional distress claim by again referring to the "Mother of the Year" designation and the indications that *Glamour* was taking up Morgan's cause.

 Under Virginia law, the elements of an emotional distress claim are (1) intentional or reckless conduct (2) that is outrageous and intolerable, offending generally accepted standards of decency (3) causing severe emotional distress to the plaintiff. *Womack v. Eldridge*, 215 Va. 338, 210 S.E.2d 145, 148 (1974); *Gaiters v. Lynn*, 831 F.2d 51, 53 (4th Cir.1987). Whether conduct is sufficiently outrageous is, in the first instance, a question of law to be decided by the court, but where reasonable persons may differ, the issue is for the jury. *Womack v. Eldridge*, 215 Va. 338, 210 S.E.2d at 148 (*quoting* Restatement of

---

in July 1987, the Eastern District of Virginia Clerk's Office may have interpreted (incorrectly) an order of the District Judge to be a directive to seal the entire file. Two years thereafter, on May 8, 1989, the District Judge by Order stated that the file, with only a few excepted documents, was not sealed and directed the Clerk's Office to allow public access to it.

**9.** Defendants argue that it would be "repugnant to the First Amendment" to permit the Foretichs to maintain an action based on allegations in a reader's letter. Leaving aside that defendants cite no authority for this proposition, it is significant that the reader's letter was followed by an editor's note purporting to validate the statement challenged in the letter by providing the source.

Torts (Second) § 46 at 77). In *Gaiters v. Lynn*, 831 F.2d at 53, the Fourth Circuit opined that Virginia law is accurately expressed in the Restatement section 46 comment d, which provides a strict standard for this tort: "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."

■■■ The Court finds no showing whatsoever of outrageous conduct with respect to the "Mother of the Year" designation and other signs of *Glamour*'s support for Morgan. In *Hustler Magazine v. Falwell*, 485 U.S. 46, 50–51, 108 S.Ct. 876, 879, 99 L.Ed.2d 41 (1988), which reversed a jury verdict for the plaintiff on a claim of intentional infliction of emotional distress under Virginia law, the Supreme Court concluded that the First Amendment's concern for robust public debate is applicable to emotional distress claims as well as defamation claims. Given this principle, it cannot be that a media outlet that simply takes a position, however strong, on a celebrated matter involving issues of strong public concern is thereby liable for inflicting emotional distress.

■■■ However, as to the claim involving the deceased child, the Court cannot say, on this motion to dismiss, that the claim is invalid as a matter of law. As indicated above, it is not clear that the statement is a substantially correct account of the Fretta deposition, let alone an accurate account of the underlying events or a fair representation of the reasons for Fretta's consultation with Eric Foretich. Its relevance to the Foretich–Morgan dispute is dubious, as it purports to recount events occurring far in the past, so the applicability of a First Amendment "fair comment" privilege is subject to question. Moreover, the statement may appear to imply in a somewhat inflammatory manner that there was something abnormal about Eric Foretich's youth and something grossly improper about Doris Foretich's conduct. A reader might come away with the impression that Doris Foretich handed her son the infant because she was cold and uncaring, whereas the Fretta deposition suggests that her son was left holding the infant because Doris Foretich was emotionally shaken by the trauma of the death. The Court concludes that the emotional distress claim with respect to this aspect of the case, as with the defamation claim based on the same aspect, must be subjected to further development of the relevant facts and other defenses.

## IV. *Defendant Trebilcock*

Defendants argue on these motion papers that defendant Bob Trebilcock, author of the November 1988 *Glamour* article, must be dismissed because his sole involvement with the case, as alleged by plaintiff, was with the November article.[10] Plaintiffs respond by alleging that Trebilcock's involvement with the letters to the editor page "is clearly evident," particularly because Trebilcock would have been in a position to know the source of the allegation regarding the Foretich infant. Given that the only statement remaining in the case has its direct origin in Trebilcock's article, and that defendants have presented no facts to indicate that Trebilcock (or any other individual defendant) was not directly involved in writing or publishing the letters page, the Court declines to dismiss Trebilcock at this stage as to either the defamation or the emotional distress claim, subject to factual development of his involvement, if any, with the writing and publication of the reader's letter and the responsive editor's note.

## V. *Further proceedings*

The Court concludes that all claims must be dismissed, except for claims of defamation and intentional infliction of emotional distress based on Statement (6), i.e.

---

**10.** Defendants have not pursued their previous suggestions that defendant *Glamour* is not a legal entity, that defendant Conde Nast has merged into a new entity, and that defendant

S.I. Newhouse is too "far removed" from the work of *Glamour* to be held liable. *See Foretich v. Glamour,* 741 F.Supp. at 249 note 1.

the letter and editor's note concerning the deceased Foretich infant, as detailed in paragraphs 3 and 6 of plaintiffs' Statement of Remaining Claims. General discovery may proceed on these claims, and a status/scheduling conference is set for January 9, 1991, at 9:00 a.m. in Courtroom No. 6 to set dates for discovery cutoff, any further dispositive motions, pretrial conference, and trial.