**GENERAL PRODUCTS COMPANY, INC., Plaintiff,**

v.

**MEREDITH CORP., Defendant.**

Civ. A. No. 81–0246–R.

United States District Court,
E. D. Virginia,
Richmond Division.

Nov. 17, 1981.

**548**

William M. Sokol, Fredericksburg, Va., for plaintiff.

Alexander Wellford, Richmond, Va., for defendant.

## MEMORANDUM

MERHIGE, District Judge.

This is an action by a Virginia corporation against a corporation existing under the laws of Iowa seeking damages for defendant's publication of statements which allegedly defamed the plaintiff and disparaged its products. Jurisdiction is founded on 28 U.S.C. § 1332, diversity of citizenship.

The matter is before the Court on defendant's motion for summary judgment.

Plaintiff is in the business of manufacturing, distributing and selling a type of chimney known as a triple-wall chimney.

Defendant is the publisher of Better Homes and Gardens Magazine and several special interest publications of that magazine, including the Better Homes and Gardens Home Plan Ideas Magazine ("Ideas Magazine").

This suit is bottomed on an article written by Douglas M. Lidster, an employee of the defendant, which appeared in the Summer 1980 issue of Ideas Magazine. The article dealt with the use of wood stoves for heat, and discussed the types of chimneys used in connection with such stoves.

Plaintiff objects to these statements ("subject statements") in the article, printed under a section labeled "SAFETY":

DON'T CONSIDER THE TRIPLE–WALL chimneys with air spaces between the sheet metal layers. These are intended for use with prefabricated fireplaces. The chimney you want has two layers consisting of inner and outer walls with mineral wool insulation sandwiched between. And by all means, don't think you can get by with stovepipe on the exterior of the house.

*What's all the fuss?* We're trying to minimize the potential buildup of creosote. As mentioned earlier, all of the volatile substances produced by combustion are not consumed in a fire. Some of these substances exit with the smoke, but condense into a liquid form when the temperature drops to a certain level. After a time, this liquid hardens into a semisolid mass lining the chimney.

A COLD CHIMNEY, SUCH AS A SINGLE–WALLED stovepipe outside, contributes to a tremendous accumulation of creosote. The same is true of the triple-wall chimneys intended for prefabricated fireplaces. (These chimneys, however, are perfectly safe for fireplaces because a hearth fire generally is hotter than a stove fire, and most of the volatiles that could condense into creosote are consumed.)

Even a sound masonry chimney isn't ideal. Its total mass allows for a lot of cooling before the smoke exits. And, because inner flue generally is oversized for the stove, the smoke lingers on its way up, allowing even more condensation to take place.

The mineral-wool-packed units, however, work well because they are hot chimneys. The same insulation that keeps the outer walls safely cool allows the inner surfaces to stay quite hot, minimizing condensation. These factory-built units are called all-fuel chimneys. The more commonly used brands are Heatilator, Metalbestos, Pro-Jet, and Selkirk.
Ideas Magazine at 88.

A chimney with a "hot" inner surface reduces the dangerous accumulation of cresote on the interior of the chimney, while "cold" chimneys allow this build-up. The article went on to describe vividly the risk of chimney fires posed by creosote accumulation.

Plaintiff argues that the import of the subject statements was that triple-wall chimneys are safe for use only for prefabricated fireplaces and not for stoves, because they allow the accumulation of cresote when used with stoves, presenting a fire hazard. Plaintiff alleges that these statements were false, and were intended to and did disparage its products and defame its name, causing it injury in the loss of good will, reputation and sales of all its products.

Defendant admits that the original Lidster article was inaccurate, in that it did not distinguish between the two types of triple-wall chimneys, the Thermosyphon type and the air-insulated type. In the Thermosyphon chimney, states the defendant, air flows through open passages and cools both in the inner and outer surfaces, presenting the creosote build-up danger. But in the air-insulated type, which plaintiff manufactures, the passages are partially blocked, allowing the air to act as an insulator to keep the inner surface hot while the outer stays cool, thus minimizing creosote accumulation. Mr. Lidster states by affidavit that he did not become aware of the distinction until after the article in Ideas Magazine was published, and discussed the difference in two subsequent rewrites of the article.[1] Defendant contends that the subject statements did not refer specifically to the plaintiff or its product, they were not published with known falsity or reckless disregard for the truth, and that they are not capable of the alleged defamatory construction.

The Court views the issues to be:
(1) the Virginia standard of liability for defamation of character or reputation;
(2) the Virginia standard of liability for product disparagement; and
(3) whether these statements are capable of any defamatory meaning.

1. *Defamation of Character or Reputation* :

■ The tort of defamation concerns an invasion of the interest in reputation and good name, and provides protection for this "relational" interest. False statements which tend to injure reputation, "diminish the esteem, respect, goodwill or confidence in which the plaintiff is held, or to excite adverse, derogatory or unpleasant feelings or opinions against him" are seen as defamatory. Prosser, *Law of Torts*, § 111 (4th ed. 1971) ("Prosser").

■ A corporation may be defamed by statements which cast aspersion on its hon-

---

1. Lidster Affidavit at 3–4. The rewrites were published in the Winter, 1980 issue of Better Homes and Gardens Building Ideas and the Spring, 1981 issue of Better Homes and Gardens Remodeling Ideas.

esty, credit, efficiency or its prestige or standing in its field of business. Prosser, § 111; Restatement (Second) of Torts, §§ 561, 573 (1976). *Cf. Arctic Company, Ltd. v. Loudoun Times Mirror*, 624 F.2d 518 (4th Cir. 1980), *cert. den.* 449 U.S. 1102, 101 S.Ct. 897, 66 L.Ed.2d 827 (1981) (company as plaintiff). Thus, plaintiff's allegation that the subject statements defamed its name presents a cognizable defamation claim.

█ Of course, the plaintiff may not bring a defamation action unless the subject statements refer to it, *i. e.* unless they were "of and concerning" the plaintiff. *Ewell v. Boutwell*, 138 Va. 402, 121 S.E. 912 (1924). The *Ewell* court set up the following rules:

> If the class or group involved is a very large one, and there is little or nothing which applies to the particular person who brings the action, his right of recovery will generally be denied.... On the other hand, if the language employed is directed towards a comparatively small or restricted group of persons, then any member thereof may sue.

121 S.E. at 914.

Plaintiff has claimed that the group adversely affected by defendant's statements, those who make and sell air-insulated triple-wall chimneys, is a comparatively small group, entitling it to sue as a member of that group. The record, regrettably, does not reflect the size of this class of manufacturers. It suffices for the purpose of this motion that the group appears to be a relatively small one. Determination of the exact size of the class must await the development of further evidence.

Under Virginia common law, defamatory words which prejudiced a person in his or her profession or trade were actionable *per se*, raising a *prima facie* implication of malice on the part of the author, as well as a conclusive presumption of damage to the plaintiff, from the mere fact of publication. No further proof of malice or injury was required beyond proof of the publication itself. *Shupe v. Rose's Stores, Inc.*, 213 Va. 374, 192 S.E.2d 766 (1972); *Story v. Norfolk-Portsmouth Newspaper, Inc.*, 202 Va. 588, 118 S.E.2d 668 (1961). Under this strict liability standard, "malice" was merely a fictional element of the plaintiff's cause of action. Prosser, *supra*, §§ 112, 113. The plaintiff was required to plead the falsity of the statements, but not to prove it. Once the fact of the publication of defamatory statements was shown, the plaintiff was entitled to a verdict, unless the defendant enjoyed a privilege or immunity, or was able to establish an affirmative defense, such as truth. *See Story, supra*; Eldredge, *The Law of Defamation*, § 6 (1978); Eaton, *The American Law of Defamation Through Gertz v. Robert Welch, Inc. and Beyond: An Analytical Primer*, 61 Va.L.Rev. 1349, 1353 (1975).

The Supreme Court of the United States has played a role, however, in the development of the elements of a defamation action since its decision in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), in order to define the effect on these state laws of the First Amendment's protection of free speech and press.

*New York Times* established the rule that a public official may not recover damages for a defamatory falsehood relating to his official conduct unless he proves, by clear and convincing evidence, that the statement was made with "actual malice," *i. e.*, with knowledge that it was false or with reckless disregard of whether or not it was false. This constitutional privilege was extended to defamatory criticism of public figures in *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967).

In *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the Court refused to extend the privilege to criticism of issues of "general or public interest." Where the defamatory falsehoods, held the Court, injured a private individual, not a public official or figure, the states are free to define for themselves the appropriate standard of liability, so long as they do not impose liability without fault. After this wholesale rejection of common law rules of strict liability, the Court ruled that a state may not allow recovery of presumed

or of punitive damages unless the liability in the case is based on a showing of knowledge of falsity or reckless disregard for the truth. Without such a showing, a plaintiff may recover only actual loss.[2]

Since *Gertz*, then, the initial question in any defamation case is whether the plaintiff is a public figure or official, or a private individual or entity. Those in the public's eye must meet a more stringent test of liability in order to recover because they enjoy greater access to the channels of public communication, and thus have a better opportunity than do private figures to counteract the effect of false statements through self-help measures. Also, public persons are seen as less deserving of judicial protection because they have exposed themselves to the risk of defamation. *Gertz, supra,* at 344–45.

 It is obvious from the present record that the plaintiff in the instant case is not a public official. A public figure characterization, said the *Gertz* court, may rest on either of two alternative bases. An individual may achieve such "pervasive fame or notoriety" that he or she becomes a public figure for all purposes, or an individual who voluntarily injects himself or is drawn into a particular public controversy becomes a public figure for a limited range of issues. *Id.* at 351.[3] It is also clear that a defendant charged with alleged defamation cannot, by his own conduct, create his own defense by making the plaintiff a public figure. *Hutchinson v. Proxmire,* 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979).

The Court of Appeals for the Fourth Circuit dealt with the distinction in *Arctic Co., Ltd. v. Loudoun Times Mirror, supra,* a libel suit by a company engaged in historical and archeological research on a government project against a newspaper and a reporter

and his source. Finding that the company was not generally known in the community and did not "press itself" into a pre-existing public controversy over the project's proposed use of an island for the construction of water intake facilities, the court held that the company was not a public figure.

Two comparable cases from other jurisdictions provide guidance here. *Bruno & Stillman, Inc. v. Globe Newspaper Co.,* 633 F.2d 583 (1st Cir. 1980), was an action against a newspaper publisher by a corporation which manufactured and sold commercial fishing boats. The plaintiff claimed that by publishing several articles describing reported defects in plaintiff's boats, the defendant had negligently or maliciously defamed the company's reputation. Noting Professor Tribe's statement that "[a] fairly high threshold of public activity is evidently necessary for a finding that a person has voluntarily plunged into a public controversy,"[4] the court rejected the district court's holding that all corporations which sell products are public figures. It held that the defendant was not a public figure, since the record did not show that it had thrust itself into any pre-existing controversy, nor had it tried to "engage the public's attention to attempt to influence the outcome." 633 F.2d at 591.

The plaintiff in *Steaks Unlimited, Inc. v. Deaner,* 623 F.2d 264 (3rd Cir. 1980), was a meat producer which claimed that a broadcast by the defendants, a reporter and a television station, stating that a meat sale by the plaintiff involved misrepresentation by the company as to the quality and price of the beef, had damaged the company's reputation and caused it to lose business. In affirming a summary judgment awarded the defendants, the court concluded that the plaintiff had so thrust itself into the purview of the area public through an in-

---

2. The rules are codified in Restatement (Second) of Torts, §§ 580A, 580B, 621 (1976).

3. *See also, Wolston v. Reader's Digest Ass'n, Inc.,* 443 U.S. 157, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979) (neither the fact that plaintiff chose not to appear before a grand jury knowing that publicity would follow, a citation for contempt, nor that these attracted media attention ren-

dered him a public figure); *Hutchinson v. Proxmire,* 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979) (recipient of federal grants held not to be a public figure merely because local papers reported the grants or because he had access to the news media).

4. L. Tribe, *American Constitutional Law,* 645 (1978).

tensive advertising blitz promoting the meat sale that it had created a controversy for the purpose of influencing the consuming public, and could be characterized as a public figure for purposes of the controversy giving rise to the suit.

There is no evidence, or even a suggestion, in the record that the plaintiff possesses such fame or notoriety that it qualifies as a public figure for all purposes. Nor is there any indication of any public controversy surrounding the use of triple-walled chimneys, that the plaintiff has injected itself or been drawn into any such controversy, or that it has engaged in any media blitz to influence the public on a matter of public interest. On the present record, the Court concludes as a matter of law that the plaintiff is a private entity.

Since the plaintiff is a private figure, the actual malice rule of *New York Times* does not apply, and this case falls within the category of defamation cases for which the Commonwealth of Virginia may define its own standard of liability for actual injury, so long as it does not impose liability without fault.

The Supreme Court of Virginia in *Newspaper Publishing Corp. v. Burke*, 216 Va. 800, 224 S.E.2d 132 (1976), disapproved of a jury instruction allowing the imposition of liability without fault, but specifically declined to determine the standard of liability it would adopt in a proper case for recovery of actual damages. In a footnote, the court related that some courts had adopted a negligence standard with the duty of care based on the "reasonable man" or "reasonably prudent publisher" standard, while others had reinstated a *New York Times* actual malice test. 224 S.E.2d at 136 n.3. Because statements which tended to injure a person in his profession or trade were once actionable *per se* under Virginia law, and because the *Burke* court seemed to note the negligence test with some approval, it is likely that the Virginia court would adopt a negligence standard in a case, such as this

one, involving alleged injury to business reputation.

■ There is evidence in the record raising the possibility that Mr. Lidster, who was solely responsible for the article, was negligent in its preparation, and issues of fact abound on this question. In writing the piece, he relied on an earlier book and article and did not examine them directly, but drew on his general recall of their content.[5] He did not contact the author of either source for an update, was not aware that the information in the magazine article had been repudiated by a subsequent article in another publication, and did not contact anyone in the industry on testing relevant to his subject.[6] Defendant's motion for summary judgment on this point is denied.

■ Plaintiff has also asserted a claim for punitive damages, which are recoverable only if it proves by clear and convincing evidence that the defendant published the article with knowledge of its falsity or with reckless disregard for the truth. *Gertz, supra*, 418 U.S. at 349–50, 94 S.Ct. at 3011–12; *Burke, supra*, 224 S.E.2d at 136. This standard is met if the defendant entertained serious doubts as to the truth of his publication, *St. Amant v. Thompson*, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968), or if the publication was made with a "subjective awareness of probable falsity," *Gertz, supra*, 418 U.S. at 334 n.6, 94 S.Ct. at 3004 n.6. *See Steaks Unlimited, supra* (summary judgment for defendants in a case brought by a public figure affirmed; affidavits by defendants as to how they gathered their information and their belief in the veracity of their statements held to provide sufficient factual support for the defense that defendants believed their statements to be true; affidavit submitted by plaintiff which questioned some of defendants' charges made in their broadcast did not raise any triable issue of fact). Mr. Lidster has stated that

---

5. Lidster Affidavit at 2–3.

6. Lidster Deposition at 24–28 (October 2, 1981).

he believed the subject statements to be accurate when he wrote the article and did not entertain any doubt as to its veracity until after it was published.[7] Plaintiff has offered its deposition of Mr. Lidster, in which he states that he had no interest in or connection to any of the manufacturers of the various types of chimneys discussed in his article, was not directed by the defendant to favor any one type, was not aware of testing or publications disputing his conclusions, did not consider any possible harm to makers of triple-wall chimneys from the article, believed that his assertions were true and had no concern about its accuracy after he completed the piece.[8] In short, there is nothing in the record from which the fact-finder could infer that Lidster entertained any doubts about the veracity of his statements or otherwise acted in reckless disregard of their accuracy. Summary judgment is thus awarded defendant on plaintiff's punitive damages claim as it relates to defamation.

2. *Product Disparagement* :

 Statements which discredit the quality or utility of a producer's goods may be actionable as disparagement of goods or product disparagement,[9] a tort designed to protect the owner's interests in the vendibility of his products. A statement which discredits the owner's personal business reputation as well as the quality of his goods may be actionable both as a product disparagement and as personal defamation. *See* Restatement (Second) of Torts, § 573, Comment g (1971).

The Court is unaware of any Virginia authority concerning product disparagement as such. *Charlottesville Music Center,*

*Inc. v. Magnepan, Inc.,* 655 F.2d 38 (4th Cir. 1981).

 In such a situation, guidance must be found in other sources. The general rule is that a person who publishes false matter disparaging the quality of another's goods, which the publisher should recognize as likely to result in pecuniary loss to the other through the effect of the statements on the conduct of a third person, is liable to the person for pecuniary loss which results if:

(1) he intended that the publication of the statement cause harm to the pecuniary interests of the other person, or either recognized or should have recognized that it was likely to do so, and

(2) he knew that the statement was false or acted in reckless disregard of its truth or falsity.

Prosser, *supra*, at § 128; Sack, *Libel Slander and Related Problems,* 456–58 (P.L.I. 1980); Restatement (Second) of Torts, §§ 623A, 626.[10]

These sources provide, as alternative tests of the requisite state of mind of the defendant, that he is liable also if he:

(1) had a motive of ill will toward the plaintiff, or

(2) had an intent to interfere in an unprivileged manner with his interests.

The Restatement takes no position as to the constitutional validity of these latter two tests, and relates that it is unclear to what extent the dictates of the First Amendment established by the Supreme Court in the *New York Times—Gertz* line of cases apply to a product disparagement action. At any rate, this Court does not have to decide this issue, for it has concluded that plaintiff is a private, not public, figure. Even if the First Amendment's

---

7. Lidster Affidavit at 3.

8. Lidster Deposition at 18–20, 26–28, 32, 36, 38, 42–43 (October 2, 1981).

9. This tort has been called "product disparagement," "disparagement of goods," "trade libel" or "slander of goods." For the sake of simplicity, the Court refers to it as "product disparagement." The term "injurious falsehood" has

traditionally referred collectively to the tort of product disparagement and that of "slander of title," which involves statements that question an owner's title to his goods.

10. This is essentially the law of New Jersey, followed by the court in *System Operations Inc. v. Scientific Games Development Corp.,* 555 F.2d 1131 (3rd Cir. 1977).

provisions do apply to a product disparagement case, all *Gertz* would require here is that liability not be imposed without fault. This easily leaves intact the common law bases of liability set forth above.[11]

■ There is no evidence in the record that the defendant (Lidster) acted in reckless disregard for the truth of his statements, with knowledge of their falsity, with any ill motive toward those in plaintiff's class, or with any intent to interfere in an unprivileged way with their interests. Summary judgment for defendant on the product disparagement claim is proper since there is no disputed issue of fact on this question.

3. *Defamatory Meaning of the Subject Statements* :

■ A factual question is presented as to the defamatory meaning of the subject statements. In a defamation case, it is not necessary that defamation be charged in the statements in direct terms; it may be made by inference, implication, innuendo or insinuation. *Old Dominion Branch No. 496, N.A.L.C. v. Austin*, 213 Va. 377, 192 S.E.2d 737 (1972), *rev'd. in other respects*, 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974). The subject statements here are clearly capable of a construction disparaging to plaintiff's reputation.

An appropriate order shall issue.

---

**11.** For the same reason, the Court need not pass on the merit of plaintiff's argument that defendant's statements constituted commercial speech and were thereby entitled to a lesser degree of First Amendment protection than the *New York Times* actual malice standard.