Eric A. FORETICH, Vincent P. Foretich,
and Doris Foretich, Plaintiffs,

v.

ADVANCE MAGAZINE PUBLISHERS,
INC., the Conde Nast Publications, Inc.,
Judith Coyne, and Bob Trebilcock, De-
fendants.

Civ. A. No. 89–3099.

United States District Court,
District of Columbia.

June 4, 1991.

Elaine Mittleman, Falls Church, Va., for plaintiff Eric A. Foretich.

MacKenzie Canter, III, Mark J. Diskin, Washington, D.C., for plaintiffs Vincent P. Foretich and Doris Foretich.

Roslyn A. Mazer, Washington, D.C., for defendants.

## MEMORANDUM

GESELL, District Judge.

The Amended Complaint alleges libel and intentional infliction of emotional distress. Jurisdiction is based on diversity of citizenship. Plaintiffs are Eric Foretich, an oral surgeon, and his parents, Vincent and Doris Foretich. Defendants are a publishing company, one of its editors, and a freelance writer.[1] By the end of three rounds of motions to dismiss, the Court had dismissed the bulk of the claims on statute of limitations and other grounds. *See Foretich v. Glamour*, 741 F.Supp. 247 (D.D.C. 1990); *Foretich v. Glamour*, 753 F.Supp. 955 (D.D.C.1990) (two opinions). The remaining claims concern only a letter to the editor and an accompanying editor's note published in the January 1989 edition of *Glamour* magazine. After discovery, de-

---

**1.** Stipulations of the parties have led to the dropping of defendants "Glamour" and S.I. Newhouse and the addition of defendant Advance Magazine Publishers, Inc.

fendants move for summary judgment, and plaintiffs oppose. The motion has been fully briefed and argued. A bench trial has been set for June 24, 1991.[2]

After full consideration, the Court concludes: (1) all defendants must be granted summary judgment on the defamation and emotional distress claims of plaintiff Vincent Foretich; (2) all defendants must be granted summary judgment on the defamation and emotional distress claims of plaintiff Eric Foretich; (3) although plaintiff Doris Foretich is a limited purpose public figure, her defamation and emotional distress claims must proceed to trial, except that defendant Bob Trebilcock must be granted summary judgment as to both claims.

*I. Background*

It is worth briefly repeating the context in which this dispute arises. Eric Foretich is the father and Elizabeth Morgan, a plastic surgeon, is the mother of a minor child, Hilary, born in 1982. After the couple divorced, they became embroiled in a highly publicized proceeding in the Superior Court of the District of Columbia over Foretich's rights to visit with Hilary. Morgan, who had been awarded custody subject to limited visitation rights for her ex-husband, adamantly refused to produce Hilary before the Court, as ordered, and beginning in 1987 she was jailed for 25 months because of her defiance. She justified her actions in various statements claiming, among other things, that Foretich and his parents, Vincent and Doris Foretich, had sexually abused Hilary, a charge they vigorously denied. The dispute was accompanied by vehement accusations back and forth and a rising media interest. Apart from the custody case in Superior Court, the dispute also went to trial in February 1987 in a suit initiated by Morgan in the United States District Court for the Eastern District of Virginia on opposing tort claims by each side. By the time *Glamour* published its January 1989 issue, the events and issues were being highly publicized nationally on television, radio and in many newspapers and magazines. Foretich made public appearances, as did Morgan.

The controversy and the rulings of the presiding Superior Court judge engendered discussion on issues of public concern, including child abuse, women's rights, the intrusion of the state into private affairs, and the limits of punishment for contempt of court. Morgan's staunch, unrelenting position attracted both supporting and adverse comment. Ultimately, Congress became involved, enacting in 1989 special legislation signed by the President effecting Morgan's release from jail.

*Glamour,* published in New York by the Conde Nast organization, appeared to support Morgan's position, as the series of publications originally challenged by the Amended Complaint reveals. *Glamour* included in its November 1988 issue, published in early to mid-October 1988, an article entitled "Hiding Hilary," authored by freelance writer Bob Trebilcock. The article, which dealt broadly with the Morgan–Foretich dispute, included the following passage concerning Eric Foretich's background:

> Eric Foretich was a native Virginian. His mother, a Daughter of the American Revolution, taught art and his father was an engineer. He is his parents' only living child. When Eric was in his twenties, his younger brother was killed in an auto accident; *earlier, when he was in his teens, a sister died shortly after birth. Eric's mother handed him the dead infant, and he arranged for the funeral* [emphasis added].

Subsequent to publication, *Glamour* received a substantial number of letters to the editor regarding "Hiding Hilary."

---

**2.** The case was removed to this Court from the Superior Court of the District of Columbia on October 16, 1989. No jury demand was made by either side. On February 4, 1991, defendants filed an amended answer expanding their affirmative defenses, and on February 13, 1991, plaintiffs made timely request under Fed.R. Civ.P. 38(b) for a jury trial on the new defenses, and also moved the Court, in its discretion under Fed.R.Civ.P. 39(b), to permit jury trial of the entire case. However, plaintiffs withdrew their jury demands in late May, and their motion is therefore moot.

Most favored Morgan's side. However, among the few letters supporting Foretich were strongly worded letters from individuals who identified themselves as J.F. McGlohn and Carolyn F. Belote. Editors at *Glamour* learned prior to publication, although the letters did not so indicate, that McGlohn and Belote were sisters of Doris Foretich.[3]

The McGlohn letter, dated October 11, 1988, and stamped as received by *Glamour* on October 19, 1988, stated:

I have just completed reading the "story" entitled "Hiding Hilary" written by Bob Trebilcock in your Nov. issue and I find it totally incredulous that this sort of trash found its way to Glamour Magazine. I thought that this kind of libellous material was only printed by the "rags" such as the "National Enquirer" or "Star," etc..

Obviously this writer must be on Elizabeth Morgan's payroll as he has written her heinous lies as *facts.*

How dare he or your magazine print her lies without researching them for credence?

*One of the sickest lies was the one relating to the death of Dr. Foretich's infant sister when he had just turned 16. She died in the hospital from a blood disorder and was never returned to their home. To state, as a fact, that his mother handed him the "dead infant, and he arranged the funeral is horrendous and inexcusable.* [emphasis added]

To have this fabrication from the mind of a woman who has been proven to have multiple mental disorders and who is totally evil, labeled as "A *true* story of love, divorce, etc., is the *worse* form of irresponsible journalism.

Did it ever occur to Bob Trebilcock or your magazine that any sane mother, who had an ounce of love for her daughter, would never smear her picture in every magazine she can get to print it, to follow and stigmatize her for the rest of her life? This woman is totally incapable

of "love" and her only objective is to gain total power over Hilary, to seek vengeance to Dr. Foretich and his parents and all the horrid publicity she can muster to promote her "writings."

For your magazine to support her evil determination to totally ruin the lives of three honorable, loving, supportive parents as the Foretichs' are and have always been, just to sell magazines is conscienceless.

If there is any integrity and fairness within your staff, you will not fail to print any negative reactions you receive in regard to this vile, untrue article.

The January 1989 *Glamour*, published in early to mid-December 1988, devoted its entire Letters from Readers page to responses to "Hiding Hilary." The McGlohn letter was selected by *Glamour* for publication. It was printed in the January 1989 *Glamour* with deletions and alterations, and followed by an editor's note, as set out below:

Your writer must be on Elizabeth Morgan's payroll, because he has written her heinous lies as *facts.* (One of the sickest was the statement that Dr. Foretich's mother handed him the body of his infant sister just after she died so he could arrange for the funeral.) Did it ever occur to the writer that no sane mother would smear her daughter's picture in every publication willing to print it, so the story could stigmatize her for the rest of her life? This woman is totally incapable of "love"; her only objective is to gain total power over Hilary, seek vengeance on Dr. Foretich and his parents, and get all the publicity she can for her books.

J.F. McGlohn
Newport News, Va.

Editor's note: **Our source for the statement concerning Dr. Foretich's infant sister was a deposition made by Nancy Fretta, Ph.D., a clinical psychologist, who testified that Dr. Foretich had told her the story during a professional consultation.** [bold in original]

---

3. *Glamour* also received a letter from Iris Layton, a third sister of Doris Foretich, but it is not clear that editors at *Glamour* knew that Layton and Foretich were sisters prior to publication.

Each of the plaintiffs, Eric Foretich, Vincent Foretich, and Doris Foretich, claims to have been defamed and to have suffered severe emotional distress based on the publication of this letter and editor's note.[4]

## II. Motion for summary judgment

### A. Vincent Foretich

Defendants contend that the challenged statements are not "of and concerning" Vincent Foretich, and thus not actionable by him as defamation. Counsel for Vincent Foretich has conceded this point. Vincent Foretich's defamation claim is therefore dismissed.

Counsel, however, continues to press Vincent Foretich's claim for intentional infliction of emotional distress. Plaintiffs' assertion that defendants "acted intentionally or recklessly, with conduct which was extreme and outrageous," Amended Complaint ¶ 36, is particularized in plaintiffs' October 22, 1990, Statement of Remaining Claims, which alleges that publication of the challenged statement "caused great anguish to the Foretich family." They contend (a) that the statement in the letter was false and wrongly bolstered by the reference to the Fretta deposition, which did not in fact support the statement; (b) that "[i]t is outrageous to speak falsely of intimate family details of no public concern which happened more than thirty years ago"; and (c) that defendants acted recklessly by relying on a deposition and should have confirmed the account through a "primary source," such as a family member.

As evidence of intent to cause emotional distress, plaintiffs allege that *Glamour* has supported Morgan by, for example, designating her as one of its Women of the Year and Mother of the Year in the December 1989 *Glamour*.

█ Under Virginia law, the elements of an emotional distress claim are (1) conduct that is outrageous and intolerable, offending generally accepted standards of decency (2) causing severe emotional distress to the plaintiff (3) where defendant either (a) acted for the specific purpose of inflicting emotional distress or (b) acted intentionally and knew or should have known that emotional distress would likely result. *Womack v. Eldridge*, 215 Va. 338, 210 S.E.2d 145, 148 (1974); *Ely v. Whitlock*, 238 Va. 670, 385 S.E.2d 893 (1989); *Gaiters v. Lynn*, 831 F.2d 51, 53 (4th Cir. 1987). Whether conduct is sufficiently outrageous is, in the first instance, a question of law for the court, but where reasonable persons may differ, the issue is for trial. *Womack v. Eldridge*, 210 S.E.2d at 148 (*quoting* Restatement of Torts (Second) § 46 at 77). In *Gaiters v. Lynn*, 831 F.2d at 53, the Fourth Circuit opined that Virginia law is accurately expressed in the Restatement section 46 comment d, which provides a strict standard for this tort: "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."

█ Defendants cite a Virginia trial court decision, *Smith v. Dameron*, 14 Media L.Rep. (BNA) 1879 (Va. 15th Cir.1987), for the proposition that a separate emotional distress claim is simply duplicative of a defamation claim based on the same publication and cannot be maintained if the defamation claim is dismissed. The court in *Dameron* relied on the risk that public figure plaintiffs would use emotional distress claims as an end-run around the actual malice requirement of *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), but after the case was decided the United States Supreme Court, in a case involving Virginia law, held that the actual malice standard applies to emotional distress claims based on speech. *Hustler Magazine v. Falwell*, 485 U.S. 46, 50–51, 108 S.Ct. 876, 879–80, 99 L.Ed.2d 41 (1988). Nevertheless, the potential for end-running other requirements of defamation law remain. If, as the Court has conclud-

---

**4.** The Court dismissed, on statute of limitations grounds, claims based on the underlying passage in the November 1988 *Glamour* article.

ed, the challenged statements do not libel Vincent Foretich, he cannot be permitted nevertheless to claim for emotional distress based on the same published words absent a specific factual showing that one or more defendants acted for the specific purpose of inflicting emotional distress on him or knew or should have known that emotional distress to him would likely result. Many people might have been upset about the article, including, for example, Doris Foretich's sisters. Libel law and the First Amendment would be completely subverted if emotional distress claims could be premised solely on a person's emotional reaction to a published statement concerning someone else. Vincent Foretich has pointed to no specific evidence, direct or circumstantial, to support the position that any defendant intended, knew, or should have known that the challenged statements would inflict severe distress on him.

Summary judgment must therefore be granted to defendants on the emotional distress claim of Vincent Foretich, as well as his defamation claim.

### B. Eric Foretich

Defendants argue that the challenged statement is not capable of a defamatory meaning with respect to Eric Foretich.

■ Under Virginia law,[5] a statement is defamatory if it tends "to injure reputation, 'diminish the esteem, respect, goodwill or confidence in which the plaintiff is held, or to excite adverse, derogatory or unpleasant feelings or opinions against him.'" *General Products Co., Inc. v. Meredith Corp.*, 526 F.Supp. 546, 549 (E.D.Va.1981) (quoting Prosser, *Law of Torts* § 111 (4th ed. 1971)). Defamation may be *per quod*, i.e. arising by innuendo from published words in combination with known extrinsic facts, as well as *per se*, i.e. appearing on the face of the publication. *Wilder v. Johnson Publishing Co.*, 551 F.Supp. 622, 623–24 (E.D.Va.1982). *See also Carwile v. Richmond Newspapers*, 196 Va. 1, 82 S.E.2d 588, 591–92 (1954) ("a defamatory charge may be made by inference, implication or insinuation"); *Gazette, Inc. v. Harris*, 229 Va. 1, 325 S.E.2d 713, 738, *cert. denied sub nom. Fleming v. Moore*, 472 U.S. 1032, 105 S.Ct. 3513, 87 L.Ed.2d 643 (1985) and *Port Packet Corp. v. Lewis*, 473 U.S. 905, 105 S.Ct. 3528, 87 L.Ed.2d 653 (1985).

Eric Foretich essentially concedes that the challenged statement does not fall into any of the formal categories constituting defamation *per se*.[6] In the case of defamation *per quod*, the defamatory meaning of innuendo must flow readily from the extrinsic facts, or inducement, offered by the plaintiff. *Wilder*, 551 F.Supp. at 624–25. *See also White v. Fraternal Order of Police*, 909 F.2d 512, 518–21 (D.C.Cir.1990).

■ The Court by previous Orders and again at oral argument directed counsel to specify how the challenged statement defamed Eric Foretich. Plaintiffs' Statement of Remaining Claims alleged that the statement

> could be understood by the reader to mean that the Foretich family acted inappropriately, in that it made a teen-ager hold a dead infant. It could also be read to mean that Dr. Foretich had psychological problems as a result of the strain and trauma of holding a dead infant. It could also be read to mean that the Foretichs were callous, uncaring and irresponsible about the death and funeral of their dead daughter.

Only the second of these possible meanings could possibly relate to defamation of

---

5. The Court has previously ruled that Virginia law applies to the claims of plaintiffs, who are all citizens of Virginia. *See* 741 F.Supp. at 250–51; 753 F.Supp. at 966 n. 3.

6. The four categories are statements that (1) charge commission of a crime of moral turpitude; (2) charge affliction with a serious contagious disease; (3) charge unfitness or lack of integrity for an office or employment; and (4) prejudice the plaintiff in his or her trade or

business. *Great Coastal Express, Inc. v. Ellington*, 230 Va. 142, 334 S.E.2d 846, 849 (1985). The first three categories are clearly inapplicable, and as to the fourth, there is no connection shown between the challenged statements and Eric Foretich's trade or business. Indeed, Eric Foretich has explicitly abandoned any claim for damages related to his oral surgery practice. Joint Stipulation of Facts filed March 27, 1991.

Eric Foretich. As to this second meaning, it is true that the central factual issue in the Morgan–Foretich dispute, reflected in the "Hiding Hilary" piece and the Letters from Readers page, was whether or not Eric Foretich abused Hilary, and clearly underlying this was the issue of Eric Foretich's mental condition. Moreover, the source of the information cited in the editor's note is a court-ordered psychological inquiry that arose in the context of a related custody dispute involving another daughter of Eric Foretich. It is urged therefore that the statement concerning the dead infant, suggesting a traumatic childhood experience at the hands of uncaring parents, can be read as charging Dr. Foretich with having serious psychological problems. This is too far-fetched. The alleged innuendo does not flow logically and naturally from what was published and the background of the case any more than a series of contrary connotations, e.g. that Eric Foretich was a responsible young man who took on the burdens of the family when called upon. There is no suggestion in the challenged statement that he felt abused, that he resisted, or that he failed to do what is suggested his mother asked him to do.

The Court declined to dismiss Eric Foretich's defamation claim on the prior motion to dismiss, pending further factual development. No new facts have emerged to support Eric Foretich's claim that the challenged statements defamed him. At oral argument, his counsel claimed that certain supporters of Elizabeth Morgan point to the "dead baby" story as evidence that all three Foretichs are involved in Satanism. No factual submissions were offered in support of this claim.[7]

Eric Foretich's defamation claim is therefore dismissed. His emotional distress claim is dismissed for the reasons stated above regarding Vincent Foretich. It would subvert defamation law to permit a cause of action for emotional distress based on a statement held as a matter of law to be not defamatory of the plaintiff. Moreover, Eric Foretich has pointed to no specif-

ic evidence, direct or circumstantial, to support the position that any defendant intended, knew, or should have known that the challenged statements would inflict severe distress on him.

## C. Doris Foretich

With respect to the defamation claim of the remaining plaintiff, Doris Foretich, defendants claim that the challenged statement is subject to qualified privilege as a report of a judicial proceeding and that the record evidence is insufficient to allow Doris Foretich to overcome the privilege. In the alternative, they argue that Doris Foretich is a public figure and that the evidence is insufficient to allow Doris Foretich to overcome the heavy burden on public figure plaintiffs in defamation cases.

■ Under Virginia law, a publication is protected by qualified privilege if it is a fair and substantially accurate account of a judicial proceeding. *See Niles v. Landmark Communications*, 12 Media L.Rep. (BNA) 1876 (4th Cir.1986). The judicial proceeding to which defendants point is the deposition referred to in the editor's note. The deponent, Dr. Nancy Fretta, is a clinical psychologist licensed in Virginia. In fall 1985, Eric Foretich retained her to conduct a court-ordered clinical evaluation of him for the Fairfax County Juvenile and Domestic Relations Court in connection with a dispute over his daughter by a previous marriage. Dr. Fretta was subsequently deposed by counsel for Elizabeth Morgan in the Eastern District of Virginia litigation between Morgan and the Foretichs. This deposition was publicly filed on March 20, 1987.

■ Dr. Fretta testified concerning her consultation with Eric Foretich, which covered his early emotional experiences. In pertinent part, Dr. Fretta testified that Foretich

was talking about his brother's death. He was talking about the death of a younger female sibling and the events

---

**7.** It is also worth noting that in briefing the prior dismissal motion, Eric Foretich effectively dropped any claim that any of the alleged de-

famatory statements raised by the Complaint accused him of child abuse. *See* 753 F.Supp. at 967.

that ensued within his family because of those two deaths....

He did ... talk about the impact that the loss of the two children had on his parents, and in essence, how the family became dysfunctional for a while, and his role in making arrangements for things that were really fairly inappropriate for a youngster at his age at the time. He was making funeral arrangements, selecting burial plots, you know, seeing the dead infant, things of that sort....

He spoke about his dead infant sister and being given this child to hold as the mother is running screaming through the house.

The Court concludes that the McGlohn letter as published is not a fair and substantially accurate account of the Fretta deposition. Although the Fretta deposition, fairly read, does appear to suggest that someone gave Eric Foretich the dead body of his sister while his mother was in the house *and* that Eric made funeral arrangements for his sister (as well as his brother), *Glamour's* edited version of the McGlohn letter says something different: It says that Doris Foretich handed Eric the dead child *"so he could arrange for the funeral."* The implication is clear—Doris Foretich put a dead child in the arms of her teenage son for the purpose of allowing him to make funeral arrangements. Neither the text of "Hiding Hilary" ("Eric's mother handed him the dead infant, and he arranged for the funeral") nor the McGlohn letter as drafted ("his mother handed him the dead infant, and he arranged the funeral") suggest the purpose for Doris Foretich's action that is indicated in the January 1989 *Glamour.* Moreover, the clear implication of the Fretta deposition was that Doris Foretich was upset and traumatized, running around the house totally distressed by grief, and not simply handing over the body for purposes of delegating responsibility. *Glamour's* version put a false gloss on the deposition testimony that goes directly to Doris Foretich's libel claim, i.e. that the challenged statements make her appear cold and uncaring, suggesting that she acted in a deliberately harsh manner insensitive to the best interests of her children.

Accordingly, the Court finds that the judicial proceedings privilege does not apply.

Defendants also contend that Doris Foretich is a limited purpose public figure and cannot meet the demanding burden of proof imposed by the First Amendment on a public figure plaintiff in a defamation case. Doris Foretich contends that she is not a public figure, limited purpose or otherwise.

▮▮▮▮ Public figure status is obtained by position alone or by purposeful activity amounting to thrusting oneself into the center of a public controversy. *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). A person who injects himself or herself into a particular public controversy may become "a public figure for a limited range of issues." *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). Such a person can prevail in a libel action only by proving that the defendant acted with "actual malice" under *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

▮▮▮▮ To determine whether a person is a limited purpose public figure, three requirements must be met: (1) there has been a public controversy; (2) the plaintiff has played a sufficiently central role in the controversy; and (3) the alleged defamatory statement was germane to the plaintiff's participation in the controversy. *Waldbaum v. Fairchild Publications, Inc.,* 627 F.2d 1287, 1296–98 (D.C.Cir.1980); *Tavoulareas v. Piro,* 817 F.2d 762, 771–75 (D.C.Cir.1987); *Clyburn v. News World Communications, Inc.,* 903 F.2d 29 (D.C. Cir.1990). The Court concludes after careful review of the entire record that Doris Foretich meets this test and is a limited purpose public figure.

As the Court has previously indicated, the many public policy issues raised by the Morgan–Foretich dispute made it a genuine public controversy, not merely a lurid personal matter that captured only the voyeuristic attention of the public. *Compare*

**1108**

*Time, Inc v. Firestone,* 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976).

Generally, the "central role" factor requires that the plaintiff attempted to influence the outcome of the public controversy. *Waldbaum,* 627 F.2d at 1297. A mere defense of one's conduct against public charges is not enough; a public figure is one who draws attention to himself or herself or uses his or her position in a controversy to spur public discussion. *Wolston v. Reader's Digest Ass'n,* 443 U.S. 157, 168, 99 S.Ct. 2701, 2707, 61 L.Ed.2d 450 (1979). However, it is also possible on occasion for a person to become a limited purpose public figure by being drawn into the center of the public debate without any deliberate action on that person's part. *Gertz,* 418 U.S. at 345, 94 S.Ct. at 3009; *Dameron v. Washington Magazine, Inc.,* 779 F.2d 736, 742–43 (D.C.Cir.1985) (air traffic controller involved in major crash held to be involuntary public figure).

The evidence is clear that Doris Foretich was by the time of publication a central figure in the dispute. She and her husband stayed at Eric Foretich's home during periods in which Hilary visited, and Elizabeth Morgan has charged throughout the controversy, and most pointedly in the Eastern District of Virginia case, that Doris and Vincent Foretich themselves sexually abused Hilary. Doris Foretich acted to defend herself, her husband, and her son on a number of occasions. Her statements to the press went beyond flat denials, incorporating discussions of her background and personal philosophy and criticisms of Elizabeth Morgan. *See* D.S.J. Ex. 12 at 12–17.[8] She sat for an interview with a television crew. *See* D.S.J. Ex. 31A. She did not merely defend herself in the 1986–87 suit brought by Morgan but brought counterclaims for defamation and intentional infliction of emotional distress. In short, her reaction to the controversy was to engage in a course of conduct that was likely to attract substantial attention. At the very least, she became an involuntary public figure, drawn centrally into the controversy, whether she intended to or not.

▮ Doris Foretich also disputes that the statement about the Foretich's daughter was germane to the public controversy. The record, now much more fully developed than on the prior round of papers on defendants' motion to dismiss, makes clear that the statement was germane. Doris Foretich was directly accused of child abuse by Elizabeth Morgan. On several occasions over the years, both before and after publication of the January 1989 *Glamour,* Doris Foretich has publicly mentioned her daughter's death in rebutting charges that she would engage in or permit abuse of her granddaughter. Doris Foretich's attitude toward the care and protection of children was part of the controversy; a statement indicating that she handed her dead infant daughter over to her teenage son for purposes of arranging for a funeral is therefore germane.

Thus all three aspects of the *Waldbaum* test are met, and Doris Foretich must be considered a limited purpose public figure.

A public figure can defeat a defendant's motion for summary judgment only by showing record evidence from which a reasonable factfinder might find by clear and convincing evidence that the defendant published the alleged defamatory statement with actual malice. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

▮ "Actual malice" means knowledge that the published statement was false or reckless disregard for whether or not it was false. *New York Times v. Sullivan,* 376 U.S. at 280, 84 S.Ct. at 726. Even a showing of extreme departure from normal journalistic standards and the duty to investigation are insufficient; there must be evidence, direct or circumstantial, that the defendant published with a high degree of

**8.** Defendants rely on several *Washington Post* articles quoting Doris Foretich. Doris Foretich alleges that she can only recall speaking to one *Post* reporter, that the reporter failed to identify herself as a reporter for five minutes, and that as soon as she did identify herself, Doris Foretich terminated the conversation. Doris Foretich does, however, acknowledge knowingly speaking to reporters on a "few" occasions.

awareness of probable falsity or entertained serious doubts as to the truth of the publication. *Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989).

■ The Court concludes that on the present state of the record a reasonable factfinder might find by clear and convincing evidence that defendants acted with *New York Times* malice.

Defendants recount the following sequence of events in an effort to prove that standard procedures were followed and adequate care was taken: Bob Trebilcock wrote the original version of the account of the infant's death in "Hiding Hilary" after reading the transcript of the Fretta deposition and related notes by Dr. Fretta, as well as handwritten notes attributed to Dr. William B. Zuckerman, another psychiatrist with whom Eric Foretich apparently had discussed the death of his sister.[9] When "Hiding Hilary" was fact-checked by *Glamour* researcher Donna Christiano, she reviewed the same materials. *Glamour* editor Judith Coyne decided to publish the McGlohn letter, and, because the letter had asserted that the statement regarding the infant was false and that Elizabeth Morgan must have been the source, Coyne decided to include an editor's note identifying the actual source. Coyne prepared this editor's note by asking Christiano to remind her what the source was and being reminded by Christiano of the Fretta deposition. After the editor's note was prepared but prior to its publication, Coyne spoke by telephone with Trebilcock, who confirmed that his source was the Fretta deposition. Christiano fact-checked the January 1989 Letters from Readers page either by looking at her previous notations for "Hiding Hilary," by reviewing the original Fretta and Zuckerman materials, or both.

Defendants' recounting, however, does not account for the portion of the McGlohn letter that *Glamour* did not publish, which directly alleged facts that, if true, would have rendered false the allegation regarding the deceased infant. Defendants, moreover, knew that McGlohn was Doris Foretich's sister prior to publication. In addition, there is the letter of a second sister, Carolyn Belote, dated October 19, 1988 and received by *Glamour* prior to publication of the January 1989 issue. Coyne saw the letter and acknowledges that she probably knew prior to publication that Belote was Doris Foretich's sister.[10] The Belote letter, which was apparently never shown to Christiano, includes a similar, but even more detailed, assertion:

HOW COULD YOU POSSIBLY HAVE BELIEVED, AND PRINTED, THE UTTERLY RIDICULOUS STATEMENT REGARDING THE DEATH OF THE FORETICH INFANT DAUGHTER, THAT DR. FORETICH "WAS HANDED THE INFANT AND TOLD TO MAKE ARRANGEMENTS"? ONCE AGAIN, RECORDS ARE AVAILABLE THAT STATE THE CHILD DIED IN THE RIVERSIDE HOSPITAL, IN NEWPORT NEWS, VIRGINIA, OF A RARE BLOOD DISORDER. THE USUAL HOSPITAL PROCEDURES WERE FOLLOWED. THE HOSPITAL RELEASED THE BABY TO THE PENINSULA FUNERAL HOME FOR BURIAL PREPARATION. DR. FORETICH, AT THE TIME, WAS 15 YEARS OF AGE, TOO YOUNG TO DRIVE, MUCH LESS MAKE FUNERAL ARRANGEMENT. YOUR ARTICLE TRIED TO PRESENT THE FORETICH FAMILY AS LESS THAN THE LOVING, RESPONSIBLE PEOPLE THEY ARE. WHY?

Defendants apparently made no effort to investigate these two direct, specific assertions of facts by persons likely to have

---

**9.** The Zuckerman notes suggest that Eric Foretich made funeral arrangements, but not that he was handed the dead infant.

**10.** Defendants stress that the evidence appears to show that Coyne learned that McGlohn and Belote were Doris Foretich's sisters after she composed the editor's note. However, defendants do not show or even allege that by the time Coyne learned this it was too late to alter the text. Coyne completed the editor's note on October 28, 1988, and was apprised of at least McGlohn's relationship to the Foretichs by November 5, 1988. Publication did not occur until early to mid-December.

knowledge of them, assertions that, if proven, directly discredited the account extrapolated from the Fretta deposition and were for the most part accurate, as defendants essentially concede for purposes of their motion.[11] Instead of investigating, defendants repeated their prior account, changing it only in manner that strayed further from the Fretta deposition, and then purporting to verify it by citing the Fretta deposition as a source. The particular reasons defendants disregarded the contrary evidence have not been fully explored on the present record.[12]

■ It is not proven on this record that defendants acted with the requisite *New York Times* malice. At the same time, however, defendants have not met the standards required to prevail on summary judgment. A reasonable factfinder might conclude that there was clear and convincing evidence of malice, i.e. knowledge that the published statement was false or reckless disregard for whether or not it was false. Accordingly, Doris Foretich's defamation claim must proceed to further factual development by trial.[13]

■ Doris Foretich's emotional distress claim must also proceed to trial. Many of the elements of defamation and intentional infliction of emotional distress are essentially the same. Here the relief sought, which cannot be duplicated, is the same. To the extent elements of and defenses to the two claims may vary, it seems best to

11. The present record indicates the following facts: Paula Foretich was born on November 20, 1958. She died at Riverside Hospital on December 21, 1958, as the result of a transfusion of blood with the wrong "Rh" factor. Vincent and Doris Foretich were present with hospital personnel when the child died. Eric Foretich, who was 15 years old at the time, was at the family home with his brother, Craig. Their parents had sent them home from the hospital earlier that day when the infant's condition worsened. Paula Foretich's body was taken by hospital attendants to the hospital morgue and transferred from there to the Caffee Funeral Home by funeral home employees. Eric Foretich played no role in arranging for the funeral other than accompanying his grandfather to the funeral home to deliver christening robes and possibly assisting his grandfather in selecting a coffin. Paula Foretich was buried at Peninsula Memorial Park on December 22, 1958, the day after she died. Doris Foretich never handed Eric Foretich the dead infant.

12. After receiving a copy of the McGlohn letter, Trebilcock, in a November 5, 1988, letter, cited to Coyne an additional, confidential source for the story:

For your own piece of mind, and not the rebuttal letter to McGlohn, the story about the dead infant girl was also confirmed to me off the record by _____ who interviewed Eric, and to whom Eric told the same story about being handed the dead infant.

On November 13, 1988, Trebilcock again wrote Coyne, apparently reacting this time to the Belote letter:

Foretich was the ultimate source of the story about his little sister's death. It can be found in Fretta's deposition, and was also confirmed for me off the record by _____ . . . .
If it's a fabrication, it was fabricated by Eric. According to _____, Eric told him the baby died at home, and then was taken to the hospital. [Dr. Mary] Froning told me the same thing. Let's assume for a moment that facts in the paragraph are true. None of them would preclude Eric's mother handing him the dead child in the hospital room, and directing him to contact the funeral home to make the arrangements. He may have been too young to drive—he wasn't too young to dial the telephone.

13. Defendants argue that the editor's note itself is not libellous because by itself it is true; i.e. it is correct that *Glamour*'s source for the statement, as published in "Hiding Hilary," was the Fretta deposition, regardless of the accuracy of the deposition testimony itself or the somewhat misleading manner in which the deposition testimony was portrayed in "Hiding Hilary" and on the Letters from Readers page. (Under Virginia law, falsity is an essential element of a libel claim. *Gazette, Inc. v. Harris*, 325 S.E.2d at 725.) This argument, even if accepted, in no way alters the course of the case. Defendants do not claim that the statement included within the published version of the McGlohn letter is true, and the editor's note, purporting to validate that statement, must necessarily be introduced at trial as part of the immediate context.

Since there is no showing that the challenged statement is defamatory *per se* with respect to Doris Foretich, *see* footnote 6, *supra*, damages cannot be implied, and Doris Foretich's potential recovery is limited to special damages pled and proven at trial. *Great Coastal Express, Inc. v. Ellington*, 230 Va. 142, 334 S.E.2d 846, 849 (1985). She has adequately pled special damages within the requirements of Virginia law. *See Slaughter v. Valleydale Packers*, 198 Va. 339, 94 S.E.2d 260, 265 (1956); *Fleming v. Moore*, 221 Va. 884, 275 S.E.2d 632 (1981).

leave both claims for trial, rather than rely on pretrial discovery alone.

Defendants also argue that Bob Trebilcock must be dismissed as a defendant because there is no evidence that he took any responsible part in the publication. Doris Foretich now concedes this point. Trebilcock did provide confirmation of the source of his original article but played no role in the selection for publication of the McGlohn letter or the editing, drafting or publication of any aspect of the January 1989 Letters from Readers page.

Accordingly, with respect to Doris Foretich, defendants' motion for summary judgment will be granted in part, i.e. as to defendants' contention that Doris Foretich is a public figure and as to her claims against Bob Trebilcock, and denied in part, i.e. as to the ultimate issue of liability for both defamation and intentional infliction of emotional distress against defendants Advance Magazine Publishers, Conde Nast, and Judith Coyne.

### III. Motion to compel discovery

■ Plaintiffs' April 9, 1991, motion to compel discovery or for sanctions is denied. Plaintiffs sought disclosure of the identity of an additional source who spoke to Bob Trebilcock about the death of the Foretich infant. *See* footnote 12, *supra.* The source had agreed to supply information so long as his identity was kept confidential and Trebilcock's notes would not be disclosed. Defendants will not rely on this source in any way during trial. In support of withholding the identity of the source, Trebilcock has invoked a journalist's qualified privilege under the First Amendment to protect a confidential source and has made a showing that the requirements for invoking the privilege, as set out in *Zerilli v. Smith*, 656 F.2d 705 (D.C.Cir.1981), have been met. Counsel for plaintiffs has not replied to dispute this showing.

### IV. Motion for order striking deposition notices

Plaintiffs' March 21, 1991, Motion for Order Striking Notices of Depositions is denied, and defendants' March 29, 1991,

Motion for a Protective Order is moot, it appearing that defendants acted diligently to obtain their discovery prior to the discovery cutoff date.

### V. Motion to strike notice of filing

Plaintiffs' May 24, 1991, Motion to Strike Notice of Filing of Changes to Depositions is denied.

### VI. Pretrial and trial

As previously indicated by the Court's April 15, 1991, Order, pretrial is set for June 13, 1991, at 9:00 a.m. in Courtroom No. 6. Pretrial materials, as specified in the January 16, 1991, Pretrial Order, shall be submitted on or before June 11, 1991. Trial to the Court is set for June 24, 1991, at 9:30 a.m. in Courtroom No. 6.

An appropriate Order is attached.

### ORDER

Upon consideration of defendants' Motion for Summary Judgment and other pending motions, the oppositions thereto, and the entire record herein, and for the reasons stated in the accompanying Memorandum, it is hereby

ORDERED that summary judgment is granted to all defendants on the defamation and intentional infliction of emotional distress claims of plaintiff Vincent Foretich; and it is further

ORDERED that summary judgment is granted to all defendants on the defamation and intentional infliction of emotional distress claims of plaintiff Eric Foretich; and it is further

ORDERED that summary judgment is granted to defendant Bob Trebilcock on the defamation and intentional infliction of emotional distress claims of plaintiff Doris Foretich; and it is further

ORDERED that summary judgment is granted in part and denied in part to defendants Advance Magazine Publishers, Conde Nast, and Judith Coyne on the defamation and intentional infliction of emotional distress claims of plaintiff Doris Foretich: The Court determines that Doris Foretich

is a public figure subject to the evidentiary burdens of *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) and *Hustler Magazine v. Falwell,* 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988), but the ultimate issue of defendants' liability under those standards is subject to proof at trial; and it is further

ORDERED that plaintiffs' April 9, 1991, motion to compel discovery or for sanctions is denied; and it is further

ORDERED that plaintiffs' March 21, 1991, Motion for Order Striking Notices of Depositions is denied; and it is further

ORDERED that defendants' March 29, 1991, Motion for a Protective Order is moot; and it is further

ORDERED that plaintiffs' May 24, 1991, Motion to Strike Notice of Filing of Changes to Depositions is denied; and it is further

ORDERED that plaintiffs' Motion to Request Jury Trial is moot; and it is further

ORDERED that, as previously indicated by the Court's April 15, 1991, Order, pretrial is set for June 13, 1991, at 9:00 a.m. in Courtroom No. 6. Pretrial materials, as specified in the January 16, 1991, Pretrial Order, shall be submitted on or before June 11, 1991. Trial to the Court is set for June 24, 1991, at 9:30 a.m. in Courtroom No. 6.